Argued November 6, affirmed November 28, 1951

# STATE OF OREGON *v.* SIMONS and BLANCHARD
### 238 P. 2d 246

*Sidney A. Milligan,* of Eugene, argued the cause for appellants. On the brief were Immel & Milligan and Neil Brown, of Eugene.

*C. E. Luckey,* District Attorney for Lane County, argued the cause for respondent. With him on the brief was Roland K. Rodman, Deputy District Attorney.

Before BRAND, Chief Justice, and HAY, LUSK, WARNER, and TOOZE, Justices.

HAY, J.

The defendants, George P. Simons and R. A. Blanchard, were indicted for the crime of unlawful sale of unregistered securities, a violation of the Oregon Securities Law, familiarly known as the Blue Sky Law, § 80-101, et seq., OCLA, specifically of § 80-105,

OCLA. They pleaded not guilty, and waived trial by jury. Upon trial by the court they were found guilty, and each was sentenced to pay a fine of $1,000. They have appealed from the judgment.

The indictment specifically charged defendants with selling and offering for sale by repeated and continuing transactions, between June 5 and September 17, 1947, certain securities, to wit, certificates of ownership of oil properties owned and controlled by an association or organization named Northwest Petroleum, Ltd., to the public and to certain named individuals, which "shares of ownership" entitled the owner thereof to participation in the net income of said oil properties, said securities not having been registered with the Corporation Commissioner of Oregon.

There was evidence that defendant Blanchard had entered into an agreement with a Montana corporation, called Mon-O-Co, under which the corporation assigned to him a portion of the anticipated net profits from certain alleged oil properties held by it in the states of Montana and Wyoming. Under this agreement, Blanchard had undertaken to provide the money necessary to finance drilling operations on the properties, in return for a 50 per cent share of any oil developed and produced by such operations. Blanchard associated with him in his venture the defendant Simons, and one Peter D. McTavish, the latter now deceased. These three persons organized as a partnership, to which partnership Blanchard assigned all his rights under his contract with Mon-O-Co. Blanchard's only function under his agreement was to furnish the capital necessary to finance the drilling operations, and neither he nor the partnership as his assignee had any control over the actual drilling or prospecting for oil.

In pursuance of their venture, the defendants sold to a number of persons in Lane County, Oregon, percentages of interests in the rights which Blanchard had acquired in respect of the so-called oil properties. The payments made by those persons to the defendants were in some cases receipted for or evidenced by a document which is referred to in the testimony as a preliminary receipt, and in some cases by a certificate of ownership. The preliminary receipts contained, among other matters, a general description of the "oil properties" upon which, it was stated, wells were to be drilled. They included also the following statement:

"The project will be developed in due course according to plans in progress. The operation will be under the control of a committee selected by a majority of the interests in the project and you will receive your proportion of the net income of the operation."

At a later date, there were substituted for these preliminary receipts documents designated certificates of ownership, of which the following is a sample:

"CERTIFICATE OF OWNERSHIP

"I, GEORGE P. SIMONS, Secretary-Treasurer of NORTHWEST PETROLEUM, LTD., do hereby acknowledge receipt of full value which has been paid to me as Trustee for myself and my associates by W. D. Abel for 6 shares of ownership of the oil properties which are owned and controlled by the said NORTHWEST PETROLEUM, LTD., which have been acquired by it from R. A. Blanchard, Peter D. McTavish and the undersigned; said oil properties being located in Montana and Wyoming, which properties are owned or hereafter may be acquired by NORTHWEST PETROLEUM, LTD. and the percentage of interest which the holder of this certificate shall have in said project, shall be

such percentage of the interest in said project as the number of shares which he shall own shall bear to a total number of shares, not exceeding 300 shares, unless the number of participating shares shall be increased, in which event the holder of this certificate shall be entitled to receive such percentage of interest as his number of shares shall bear to the number of shares which may be issued in said project.

"The project is being developed in due course according to the plans in progress. The operation shall be under the control of a Board of Trustees of five (5) members selected by a majority of the interests in said project and each party shall receive his proportion of the net income of said operation in accordance with his ratio of ownership.

"Dated this 17th day of September, 1947.

"NORTHWEST PETROLEUM, LTD.
"R. A. Blanchard
"President
"Geo. P. Simons
"Secretary-Treasurer"

There was evidence on the part of defendants that the subscribers were informed that it was the intention of the promoters to cause a limited partnership to be organized under the laws of Oregon, in which partnership all of the subscribers would join as members, with the liability of each limited to the amount of money that he had subscribed.

Simons, Blanchard, and McTavish agreed among themselves that each was to own a 20 percent interest in their venture. Of such 20 per cent, each was to be permitted to sell three per cent, but no more, the intention being that such restriction would insure that control of the venture would remain in their hands.

Through their sales campaign, the defendants and

McTavish acquired a sum of money in excess of $200,-000, which money, according to their testimony, was paid to Mon-O-Co to be used in defraying the expenses of drilling on the properties.

No limited partnership or other organization of the subscribers was ever formed. The defendants gave as the reason for their failure to organize such limited partnership the fact that they were awaiting completion of the sale of all the shares of which they intended to dispose, as, until such completion, they could not determine who were to be the members.

The defendants say that the court erred in holding that they made any sales of securities within the contemplation of the statute. They argue that, under § 80-102 (c), OCLA, as amended by ch 148, Oregon Laws 1941, a sale is a transfer of title to an instrument or security for a consideration, which instrument or security is in and of itself the object of the transaction. They attempt to sustain this argument by insisting that the so-called certificates of ownership were not in and of themselves of any value whatever, nor any part of the basic transaction between the defendants as general partners and the subscribers as limited partners. Their designation of the subscribers as limited partners is, of course, incorrect, as the subscribers never became such. Defendants suggest, moreover, that the issuance of the certificates of ownership was merely the result of an afterthought on their part, occasioned by the delay in organization of the limited partnership. In our view, however, the certificates of ownership were in no sense substantially different in tenor or legal effect from the preliminary receipts which were issued by the defendant Simons for "himself and associates."

Section 80-102, OCLA, as amended by ch 148, Oregon Laws 1941, contains the following definition of "sale":

" 'Sale' or 'sell' shall include every disposition, or attempt to dispose of a security or interest in a security for a consideration. * * * 'Sale' or 'sell' shall also include a contract to sell, an exchange, an attempt to sell, an option of sale, a solicitation of a sale, a subscription or an offer to sell, directly or by an agent, or a circular, letter, advertisement or otherwise. * * *"

*State v. Gerritson,* 124 Or 525, 265 P 422, involved a sale of certain certificates of ownership, and the defendant contended that no sale of securities for a consideration had been made because some of the certificates had not been delivered until some time after the subscribers had paid their money. That case, like the present one, had to do with interests in an organization yet to be organized. The court said: "There was evidence that the offer to the prosecuting witness Klekar was accepted by him, his money received and retained and a certificate of stock thereafter issued. This transaction constitutes both an offer to sell and an actual sale." See also *United States v. Wernes,* CCA 7th, 157 F2d 797, 799; *Groby v. State,* 109 Ohio St 543, 143 NE 126, 127.

■ In this case, the transactions proved by the evidence constituted sales of interests in Blanchard's rights under his contract with Mon-O-Co. The preliminary receipts and the certificates of ownership were not the subjects of the sales but merely evidences thereof. 53 CJS, Licenses, § 75, note 28. The sales were not isolated transactions, such as are exempted from the provisions of the Securities Law by § 80-104 (b), OCLA, as amended by ch 102, Oregon Laws 1941, but were

"made in the course of repeated and successive transactions of a like character." Ibid. The court's finding that such transactions were sales within the contemplation of the statute was not erroneous.

Defendants' next contention is that there was no "public offering" of securities in this case, which, they say, the statute requires. They point out that there was no evidence of the use of any prospectus, advertisement, request for public subscription or effort at inducing public participation; that their acts in relation to the subscribers were simply those of negotiation looking toward the formation of a limited copartnership; that personal contact, with subsequent explanation, usually followed by personal investigation on the part of the respective subscribers, was the general course of procedure; that there is no evidence or claim that the subscribers were misinformed as to any fact that might have influenced them to subscribe; and that several of the subscribers actually engaged in assisting defendants in the obtaining of new subscribers.

Contrary to defendants' theory, the law does not provide that sales of unregistered securities are unlawful only when effected by a "public offering." It is true that, in § 80-102 (d), OCLA, as amended by ch 148, Oregon Laws 1941, a "dealer" is defined as one who, among other activities, purchases or acquires securities for the purpose of "offering them for sale to the public." But the offense with which these defendants are charged is not that of selling securities as unlicensed dealers, but that of unlawfully selling unregistered securities. In *Cannon v. Farmers' Union Grain Agency,* 103 Or 26, 202 P 725, *Kirk v. Farmers' Union Grain Agency,* 103 Or 43, 202 P 731, and *State v. Whiteaker,* 118 Or 656, 247 P 1077, cited by defendants herein, the

respective defendants were charged with selling certain securities without first having obtained dealers' licenses. The offenses involved in those cases were therefore not similar to that charged against defendants herein.

■ In any event, there was evidence in the present case that subscribers had been personally approached by one or other of the defendants and solicited to subscribe for shares. There was, moreover, evidence that defendant Simons, during the sales campaign, had admitted that "these undivided oil interests" were offered to anyone who, "they" thought, had sufficient funds. The limitation of solicitation to persons of means did not prevent the sales from having been effected through a public offering. The statute does not define the meaning of "offering them [securities] for sale to the public," but, in our opinion, a public offering in such cases does not require the extension of an invitation to the general public by means of a prospectus, advertisement, public invitation, or house-to-house canvass. "An offering is 'to the public' even though the effort to sell be limited to that portion of the public proven by experience to be particularly susceptible to such offers." *Mary Pickford Co. v. Bayly Bros.*, Cal App, 68 P2d 239, 242. The same rule should apply to solicitation of persons who, because of financial means, are naturally that portion of the public in which sellers of securities, whether worthy or unworthy, are interested.

■■ So, while we find nothing in the statute which requires proof of a public offering to sustain a charge such as the present, if such public offering is implied we hold it to have been sufficiently proved. ·

Defendants insist that the trial court erred in holding that the certificates of ownership involved

herein were "securities" within the meaning of the law. They concede that, in general, the courts take a rather strict view as to what are securities in this connection, but suggest that each case must be considered upon its own facts. They say that most of the courts have held that when the facts indicate that the investments under consideration were subscriptions of capital by members of a group joined together by agreement to own and hold property rights together, neither the property rights nor the evidences thereof are to be considered as securities.

As an illustration of such a case defendants cite *Polk v. Chandler*, 276 Mich 527, 268 NW 732. There, two persons were selected to hold property in their own names as trustees for themselves and certain others. The group comprised 14 persons, who had associated themselves together for the purpose of purchasing a tract of land. The owner of the land was willing to sell, but only to someone financially responsible, so it was agreed that two members of the group who were acceptable to the owner should enter into a contract to purchase the land, and should hold it under a declaration of trust and issue to all the members participation certificates evidencing the extent of their respective interests. This was done, and afterwards an action was instituted by a trustee who had succeeded the original trustees, to have the relation of all the parties to the venture, and their respective rights and obligations thereunder, determined. The court held that, under the circumstances, the certificates of participation were not securities within the contemplation of the Michigan Blue Sky Law. It based such holding, however, upon the fact that an amendment to the Michigan act exempted certain classes of securities from its scope, including certificates or other evidences of partici-

pation in a joint adventure. "Joint adventure" was defined by the amendment to be "a voluntary association of not more than twenty individuals who shall have simultaneously, without outside solicitation, joined together for the purpose of carrying out the plan or project for which the association has been organized." No such exemption appears in the Oregon act, and the cited case therefore is not in point.

Another case cited by defendants is *Hanneman v. Gratz*, 170 Minn 38, 211 NW 961, in which a group of persons joined together to purchase an oil lease, and the court held that such a purchase, although speculative, was not in violation of the Minnesota Blue Sky Law. That case was cited to the trial judge herein, who succinctly differentiated it from the instant case, saying: "There again you have the element of mutuality of burden, all of the subscribing members claiming joint rights and joint obligations between them, which feature is wholly lacking in the case at bar." We agree with the trial judge, and need add nothing to his comment.

*Sargent v. Coppage*, 47 Cal App2d 122, 117 P2d 412, is cited and confidently relied upon by defendants as announcing a principle which, they urge, should be controlling herein. There, four persons entered into an agreement whereby three of them agreed to sell to the fourth, for the sum of $4,000, an undivided four per cent interest in certain mining claims. The sellers were to form a corporation with capital stock of $100,000, and, in consideration for the transfer of his four per cent interest in the mining claims to the corporation, the buyer was to receive shares of stock in the corporation equivalent in amount to four per cent of the total corporate stock. Management of the mining claims was vested in one of the sellers, who was also

to be accorded "voting control" of the corporation. The corporation was organized, all the interested parties signing the articles of incorporation. About a year afterwards, the buyer undertook to rescind the contract, and brought suit against the sellers seeking to recover his $4,000. The trial court found against him, and he appealed. On the appeal, he contended that the agreement of the parties constituted a sale of securities, which was illegal and void under the securities law for lack of a permit from the corporation commissioner. The case was affirmed upon a split decision, three judges voting for affirmance and three dissenting. The trial court had found that the agreement of the parties, construed in the light of all the circumstances, including the subsequent events, "was a temporary expedient only and was recognized by the parties as being made for the sole and only purpose of providing a record of the interests of the parties thereto pending the formation of the corporation." The court said:

> "The question, then, is whether the plaintiff, having shared in the incorporation of the Victory Mining Company and the securing of the permit to issue stock, having received shares representing his proportionate interest and having watched the expenditure of the money over a period of ten months for the intended purpose of equipping and developing the mine, may then rescind the original contract and recover his money paid under it because the corporation was not formed by the parties within the precise ninety-day period fixed by the act. Nothing in the language of the act, nor in the decisions interpreting it justifies a construction which would enable the plaintiff to thus extricate himself from an unsatisfactory investment."

There appears to be no parallel whatever between that case and the case at bar.

Section 80-102, OCLA, as amended, includes in its definition of "security,"

"any * * * evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; * * * preorganization certificate, receipt, or subscription; transferable share; investment contract; * * * fractional undivided interest in oil, gas, or other mineral rights; any certificate, contract, receipt or instrument whatsoever representing or constituting evidence of, or secured by, title to or interest in, any oil, gas or mining lease, royalty or deed; or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing."

*State v. Whiteaker,* supra, 118 Or 656, 247 P 1077, involved prosecution for a similar offense to that charged herein. The defendant had sold "units of interest" in a partnership to be organized, which was to undertake the business of extracting gold from the waters of Mono Lake in California by means of an electrical device invented by defendant. The certificates of interest were quite similar to those in the case at bar. The court held that they were securities within the contemplation of the statute.

The federal securities act defines "security" in terms quite similar to those of the Oregon act, as follows:

"The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, reorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security,

fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." 15 USCA § 77b(1).

In *Atherton v. United States,* 128 F2d 463, a venture was promoted by a partnership under the name of Coloma Oil Company of California. The partnership, at trifling expense, procured or revived certain gas or oil leases on some 2,300 acres of land in Oklahoma in the neighborhood of a producing field. Of this area, a tract of 160 acres was selected as a site upon which it was proposed to drill a well for the purpose of proving the area. The promoters conceived and carried out a scheme for the sale of fractional interests in the leases held by them, in minimum lots of two and one-half acres each, it being represented to prospective investors that the drilling of a well on the site selected would be financed by the sale of such fractional interests. A permit was procured from the Real Estate Commissioner of the state of California for the sale of fractional interests in that state. Numerous sales were made, and a considerable sum of money realized therefrom, little of which was used in development of the drill site. Defendants contended that assignments of oil and gas leases or fractional interests therein were not securities, as that term is defined in the federal act. The court, however, held that assignments of oil and gas leases, or fractional interests therein, were "investment contracts," and hence securities within the definition of the statute.

In *Securities and Exchange Commission v. C. M. Joiner Leasing Corporation,* 320 US 344, 88 L ed 88,

64 Sup Ct 120, the defendant was engaged in a sales campaign to finance the drilling of an oil well, and in connection therewith sold to 50 purchasers leasehold subdivisions averaging from two to five acres in size. Action was instituted to restrain defendant from violating the Securities Act by means of fraudulent representations which were made during the sale of such leases. The trial court and the Circuit Court of Appeals found that the evidence justified a finding of fraud, but refused an injunction because they thought that the transactions involved simply sales of interests in land, which, they felt, did not come within the scope of § 2(1) of the act. The Supreme Court held that assignments of oil leases are "securities" or "investment contracts" within the meaning of the Securities Act of 1933, so as to require sales thereof to conform to the requirements of such act. We quote from the opinion of the court:

"In the Securities Act the term 'security' was defined to include by name or description many documents in which there is common trading for speculation or investment. Some, such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well-settled meaning. Others are of more variable character and were necessarily designated by more descriptive terms, such as 'transferable share,' 'investment contract,' and 'in general any interest or instrument commonly known as a security.' We cannot read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents. Instruments may be included within any of these definitions, as matter of law, if on their face they answer to the name or description. However, the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved

as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a "security." ' The proof here seems clear that these defendants' offers brought their instruments within these terms."

The court said further that different courts have given different answers to the general question of whether or not a statute of the sort under consideration is a penal statute and hence to be interpreted with strictness. In a footnote, the court cites, among cases tending toward strict construction, the Oregon case of *New Amsterdam Casualty Co. v. Hyde,* 148 Or 229, 34 P2d 930, 35 P2d 980. That case was a civil suit for a declaratory judgment to determine the extent of the liability of the plaintiff under a bond executed by it to qualify it as a broker of securities. The opinion, however, does not hold that the act should be strictly construed. On the contrary, it states:

"* * * The Blue Sky law was undoubtedly enacted for the protection of the investing public (State v. Whiteaker, 118 Or. 656 (247 P. 1077)) and is remedial in its nature and must be liberally construed, so as to carry out its purpose: Wright v. Wimberly, 94 Or. 1 (184 P. 740); Landers v. Van Aukin, 77 Or. 479 (151 P. 712). * * *"

■ We are not required to decide, however, whether the word "security" is to be construed strictly or liberally, as the statute itself has placed upon it a definition sufficiently liberal to include the interests for the sale of which these defendants were indicted. See *Securities and Exchange Commission v. C. M. Joiner Leasing Corporation,* supra, 320 US 344, 351, 88 L ed 88, 64 Sup Ct 120; *United States v. Monjar,* 47 F Supp

421, 426, aff CCA 147 F2d 916, cert den 325 US 859, 89 L ed 1979, 65 Sup Ct 1191.

The original receipts herein were very similar in tenor to the instruments involved in *State v. Whiteaker,* supra, 118 Or 656, 658, 247 P 1077, and *Pennicard v. Coe,* 124 Or 423, 432, 438, 263 P 920, which were held to be securities within the contemplation of the Oregon act. In the present case, the solicitation of each subscriber was a separate and independent solicitation; they were never joined together as a group. The individual subscribers had nothing to do with the scheme, after paying their money, but to wait for such returns as might result from the efforts of others. If a limited partnership eventually had been organized, control thereof would still have remained in the promoters. Even they would have had no control over Mon-O-Co or its drillers.

*Securities and Exchange Commission v. Bailey,* 41 F Supp 647, 650, defines an "investment contract" as "one which contemplates the entrusting of money or other capital to another, with the expectation of deriving a profit or income therefrom, to be created through the efforts of other persons." The certificates of ownership herein were investment contracts within that definition, and, in our opinion, were "securities" within the contemplation of our statute. *Sperry & Hutchinson Co. v. Hudson,* 190 Or 458, 469, 226 P2d 501; *Union Land Associates v. Ussher,* 174 Or 453, 458, 149 P2d 568.

The fact, if it be a fact, that the interests were intended as preorganization subscriptions in a limited partnership to be organized later, did not change their character as securities under the act. *Groby v. State,* supra, 109 Ohio St 543, 143 NE 126, 128; *State v. Gerritson,* supra, 124 Or 525, 530, 265 P 422; *State v. Whiteaker,* supra, 118 Or 656, 661, 247 P 1077;

§ 80-102 (a) OCLA, as amended by ch 148, Oregon Laws 1941. The same rule applies whether the contemplated organization is a corporation or a partnership. As stated by Mr. Justice BELT in *State v. Whiteaker,* supra, p 661:

"It is immaterial that these 'units of interest' were in a company or association yet unorganized: Groby v. State, supra. The statute is designed for the protection of the public. There is more reason for the application of this law to unorganized business concerns than to those having a recognized legal entity. The corporation commissioner would undoubtedly be more hesitant in granting a permit to sell 'securities' in a future or contemplated business than in an established and growing concern. There is more uncertainty and speculation in the former class of investments."

■ It is argued that, because of evidence that defendants intended at some future time to organize the subscribers as a limited partnership under Oregon law, we must construe the Securities Law with that fact in view. The weakness of the argument lies in the fact that we are not considering the actions of a group of persons voluntarily associated together in a joint venture, but rather a sale of securities to persons indiscriminately selected and having no bond of union other than the fact that they had money and the gambling instinct. No reasonable explanation is either suggested or readily discernible as to what was to be gained by organizing a limited partnership. The evidence clearly shows that the subscribers undertook no obligation whatever except to pay the price of their shares. There was no need to limit their liability; it was already limited. The use of the provisions of the Limited Partnership Act, ch 252, Oregon Laws 1943, as a cloak to

legalize the acts of the defendants in this case is an inadmissible expedient.

It is asserted that defendants were acting in good faith with a view to organizing the limited partnership. The same suggestion was made in Whiteaker's case, supra, coupled with the claim that the defendant had acted upon the advice of counsel that his scheme was not in violation of law. It was held that both defenses were immaterial, and that evidence thereof was clearly inadmissible. See also 47 Am Jur, Securities Acts, § 59, note 12.

■ ■ Finally, defendants say that the Securities Law, construed in the light of the later Limited Partnership Act, does not show with reasonable certainty what acts or omissions were intended to be prohibited thereby. It is well established that a valid criminal law must declare with reasonable certainty what acts it intends to prohibit. *State v. Anthony,* 179 Or 282, 288, 169 P2d 587; *State v. Bailey,* 115 Or 428, 432, 236 P 1053; *Johnson v. Oregon Stevedoring Co., Inc.,* 128 Or 121, 137, 270 P 772; 14 Am Jur, Criminal Law, § 19. In our opinion, the Securities Law conforms to the rule. The legislative intention to use the term "securities" in a broad and liberal sense was noted in *State v. Whiteaker,* supra. There is nothing in the Limited Partnership Act which tends to modify the Securities Law as applied to the facts in the case at bar.

Although defendants do not say so, it is assumed that, by attacking the statute as indefinite and uncertain, they seek to raise a constitutional question under the due process clause of the federal constitution. The Oregon Securities Law has been sustained as a reasonable exercise of the police power of the state. *American Trust Co. v. McCallister,* 136 Or 338, 345, 299 P 319, and cases there cited. Defendants do not point out

specifically wherein it is lacking in reasonableness and certainty, although they argue in a general way that the Limited Partnership Act, being later in point of time, must have been passed "with the knowledge on the part of the legislature that some instruments would have to pass from one partner to another in the process of formation" of a limited partnership, and that it was certainly not intended that such instruments should be considered as "securities" in violation of the Securities Law. We think that the argument itself is vague and indefinite. Instruments of one kind or another do pass from hand to hand in the formation of any organization, whether a corporation, partnership, or what not. Sometimes such instruments must be regarded as securities under the law, sometimes not.

*Kneeland v. Emerton,* 280 Mass 371, 183 NE 155, 87 ALR 1, 13, in sustaining the constitutionality of the Massachusetts Blue Sky Law as against the objection that it was lacking in definiteness, pointed out that the act

"does not reach into the field of economic adventure or social theory where terms may be new and nomenclature without definite and settled signification. Its purpose is to protect people from fraud in the purchase of corporate securities. Scarcely any subjects in the common law are more familiar to popular understanding than fraud and sales and securities of corporations. Almost everybody has some knowledge concerning them. Courts have been dealing with fraud and sales from early times, and with securities since corporations became business instrumentalities in wide use, now a good many years ago. They are and have been through a long period objects for frequent legislative enactments."

The Minnesota court has held that the term "investment contracts," as used in the Blue Sky Law, is not

so vague as to be insufficient to apprise persons of what acts it was their duty to avoid, and therefore its use did not render the act unconstitutional. *State v. Evans,* 154 Minn. 95, 191 NW 425, 27 ALR 1165, 1169.

We are of the opinion that the contention that the Securities Law is lacking in definiteness and certainty in the respects indicated is without merit.

We find the record to be free from error. The judgment is affirmed.