Argued February 7, reversed and remanded July 17, petition for rehearing denied August 20, 1968

# GONIA ET UX, *Appellants, v.* E. I. HAGEN CO. ET AL, *Defendants,* LEAHY, *Respondent.*

443 P. 2d 634

2

■■■■■

■■■■■■

■■■■

*Robert G. Danielson,* Sweet Home, argued the cause for appellants. On the brief were McFarlan & Danielson, Sweet Home.

*Neil A. Bennett,* Salem, argued the cause for respondent. On the brief were Brown, Schlegel, Bennett & Milbank, Salem.

Before PERRY, Chief Justice, and McALLISTER, O'CONNELL, DENECKE and LANGTRY, Justices.

■■■■■

McALLISTER, J.

This is an action to recover sums paid for securities sold in violation of the Oregon Securities Law, ch 59 Oregon Revised Statutes. The court tried the case without a jury and entered judgment in favor of plaintiffs against the defendant A. Charles Haubrock, but found in favor of the defendant Edward J. Leahy. Plaintiffs appeal from the judgment exonerating Leahy.

Since this case turns on the construction of ORS 59.250 (1), we quote the applicable portion of the statute, as follows:

ORS 59.250 "(1) Every sale made in violation of any of the provisions of the Oregon Securities Law shall be void; and the person, issuer or dealer making such sale and every director, officer or agent of the seller, if such director, officer or agent with knowledge of the violation personally participated or aided in any way in making it, shall be jointly and severally liable to the purchaser in an action at law in any court of competent jurisdiction upon tender of the securities sold or of the

contract made for the full amount paid by the purchaser, with interest, together with all taxable court costs and reasonable attorney's fees.  *  *  *"

We construed the above statute in both *Adamson v. Lang,* 236 Or 511, 389 P2d 39 (1964), and *Spears v. Lawrence Sec., Inc.,* 239 Or 583, 399 P2d 348 (1965). We held that the statute imposed liability on the following two classes of persons:

(1) The person, issuer or dealer making the sale, and
(2) A director, officer or agent of the seller, if (a) such director, officer or agent, had knowledge of the violation, and (b) personally participated or aided in any way in making the sale.

We held in *Adamson v. Lang,* supra, that the Oregon Securities Law should be "liberally construed to afford the greatest possible protection to the public." We also held in *Adamson* that the term "person * * * making such sale" includes "a person aiding another in making the sale." 236 Or at 516. We further held in *Spears v. Lawrence Sec., Inc.,* supra, that as to a person making a sale, knowledge of the violation was not a necessary element of liability. 239 Or at 585. We think that those holdings are decisive of the case at bar and require a reversal. Without doubt, Leahy aided another to make the sales to plaintiffs and their assignors.

Since the trial court found that unregistered securities were sold to plaintiffs in violation of the Oregon Securities Law, we need not pause to describe the securities in detail. We will refer to them as Life Insurance Securities Underwriting Fund, or L.I.S.U.F. We also need not decide whether Leahy knew that the securities were not registered. The controlling question is whether Leahy aided another to sell the securi-

ties. This calls for a brief description of Leahy's participation in the transaction.

Leahy in April, 1965, was licensed to sell securities in Oregon and had an office in Albany. For a number of years he had sold securities and insurance in Albany and eastern Linn county and was well acquainted in that area.

In early 1965 Leahy became aware of the efforts of several Californians, including the defendants Haubrock and Leatherman, to promote the formation in Oregon of a life insurance company and the sale of stock therein. On or about April 8, 1965, Leahy himself invested $2,000 in L.I.S.U.F.

The sequence of events resulting in the sale of securities to plaintiffs, and their assignors, started in The Candlelight, an Albany restaurant, where Leahy met one Heiko Neessen. Neessen had bought "quite a few different stocks" from Leahy, and the two men talked about investments. According to Neessen, Leahy told him about L.I.S.U.F. and asked if he might bring a representative of the company to Neessen's home. The next day, Saturday, Leahy and Leatherman came to the home of Neessen's brother-in-law, Dale Truax. Leahy had been in the Truax home "many times." There were present Leahy, Leatherman, Truax and Neessen. Leatherman explained the investment to Neessen and Truax. In response to an inquiry by Neessen, Leahy said "he thought it was a very good investment and that he had checked the guys what [sic] were in it and they seemed to be outstanding businessmen."

The following Monday, April 26, 1965, Leahy came again with Leatherman to the Truax home, where Neessen and Truax each paid Leatherman $2,000 for interests in L.I.S.U.F.

At Neessen's suggestion, Leahy and Leatherman called on Walter Miller in Crabtree, and talked to Miller and his wife about investing in L.I.S.U.F. Miller had purchased some insurance from Leahy six or seven years earlier, and knew him. Again, Leatherman explained the investment and Leahy recommended it to the Millers. Miller testified as follows:

"A As near as—as near as I can recall there was nothing said by Mr. Leahy until I actually got ready to make up my mind to invest in this and at the time I turned to Mr. Leahy, because Mr. Leahy was the only one I knew of the two, and I told him at that time that this is the first time in my life that I had enough money to invest in something or had money to invest or had done any investing and I sure didn't want to make any mistake and he assured me that I absolutely couldn't lose on my investment."

"Q Did he say anything to you about the fact that he had invested in this?
"A He mentioned that he had invested in it."

On April 27, Leahy and Leatherman also called on the plaintiff Adrian H. Gonia and his wife. This call was arranged by Dale Truax. The same format was used, with Leahy introducing Leatherman, who explained the investment, and Leahy recommending it to the Gonias. Gonia testified as follows:

"A Mr. Leahy introduced Mr. Leatherman. Introduced himself and Mr. Leatherman to me.

"Q All right.

"A And they had the papers and showed me—they had the pictures of all the officers—Mr. Leatherman had the pictures of all the officers that were going to head this company and I asked Mr. Leahy if he had investigated them and he said, 'Yes,' and they were all—what they had done, what —who they had worked for, and it looked like a

real good company to invest in, and then I asked Mr. Leahy if he thought it was a good company to invest in and he said, 'Yes. He was investing money in it,' and I said, 'Well, the only reason I would have this meeting at all—I don't know Mr. Leatherman—is because you are a broker and well represented by Mr. Truax and you have been in the securities business for quite some time.'

"Q  Did Mr. Leahy respond to that?

"A  Well, he appreciated it and they kept talking. Finally I was kind of undecided whether to buy or not and Mr. Leahy, he said, 'I can go to the phone right now and I can call up and show you I can get someone to go the rest of the money that we need,' and I said, 'Well, why did you come to me,' and he said, 'Well, we are trying to keep this in the hands of the small investors, because if one big investor gets it he can take over the company and if we did a good job we'd be elected to officers in the company and could control the company more.' "

Again, Leahy and Leatherman called on Gonia the following day, April 28, to pick up Gonia's check.

This action was brought by the Gonias on their own claim and the assigned claims of Neessen, the Truaxs and the Millers.

Leahy did not deny that he made the statements attributed to him by plaintiffs and their assignors. On the contrary, in a large measure he admitted his participation in the sale of these securities. Leahy testified as follows:

"I made it definite and clear to each and every one that I was not a representative or a salesman for the company at no time. I was not an officer of the company. I was only an investor and they would use their own judgment in making the investment. *That I had put my money in it. I thought*

*it was a good investment,* but it was up to them entirely to make their own judgment on it, whether they should invest any money or not, and that was made clear to each and every person I talked to about this company." [Emphasis added]

Leahy also testified that he played a similar role in ten other sales of investments in L.I.S.U.F.

■ The judgment in favor of Leahy was based on findings by the trial court that Leahy (1) did not "directly" make a sale, and (2) did not know that the securities were unregistered. The court erred in applying these standards to Leahy's conduct. Leahy was liable under the statute if he only "aided another in making the sale." *Adamson v. Lang,* 236 Or 511, 389 P2d 39 (1964). Leahy substantially aided Leatherman in making these sales. From a reading of the testimony it clearly appears that the decisive factor in all the sales was the confidence of the purchasers in Leahy, with whom they were acquainted, either personally or by reputation.

■ Whether Leahy knew that the securities were unregistered is immaterial. We are controlled by our holding in *Spears v. Lawrence Sec., Inc.,* 239 Or 583, 399 P2d 348 (1965), that as to a person making a sale, knowledge of non-registration is not a necessary element of liability.

■ Since the judgment of the trial court is based on an error of law, reversal is necessary. *Babler Bros. v. Pac. Intermountain,* 244 Or 459, 466, 415 P2d 735 (1966); *Watson v. Dodson,* 238 Or 621, 395 P2d 866 (1964). The judgment in favor of Leahy is reversed and the case remanded to the trial court with instructions to make new findings not inconsistent with this opinion, and to enter judgment accordingly.

Reversed and remanded.