Argued June 10, reversed and remanded, petition for rehearing
denied November 23, 1976 by opinion

MARSHALL et ux, *Respondents,*

*v.*

HARRIS, *Appellant.*

555 P2d 756

*Blair M. Henderson,* Klamath Falls, argued the cause and filed the brief for appellant.

*Owen M. Panner,* Bend, argued the cause for respondents. On the brief were Panner, Johnson, Marceau, Karnopp & Kennedy, and C. Montee Kennedy, Bend.

Before Denecke, Chief Justice, and McAllister, Tongue, and Howell, Justices.

TONGUE, J.

## TONGUE, J.

This is an action to recover money due and owing under a contract by which plaintiffs sold to defendant an interest in two racehorses and in their "earnings," in return for defendant's agreement to pay expenses involved in training and racing the horses. By affirmative defense and counterclaim, defendant contended that the contract was a "security" within the terms of the Oregon Securities Law, ORS ch 59, and that it had not been registered, as required by that statute, with the result that defendant was entitled to recover the money previously paid by him to plaintiffs under that contract.

The case was tried before the court, without a jury. The trial court held that the Oregon Securities Law did not apply to the facts of this case; that there was no sale or attempt to sell any "security," and that plaintiffs were entitled to judgment against defendant for amounts due and owing under the contract in the sum of $5,167.10.

### The facts.

Plaintiffs own a ranch near Burns where they raise thoroughbred racehorses. These horses have been raised for sale, except for the years 1964 and 1969, during which plaintiffs raced some of them.

In February 1973 plaintiffs' attorney suggested to them an arrangment under which he and three of his friends would pay the expenses for one of plaintiffs' horses in return for one-half of its winnings as a racehorse (i.e. a one-eighth interest to each of the four). An oral agreement was then made to that effect.

In May 1973 Mrs. Marshall was visited by Beverly Lewis, a longtime friend of hers, who was also interested in horses. During that visit they talked about plaintiffs' horses. In the course of that conversation Mrs. Marshall told her friend about the arrangement with plaintiffs' attorney and his three friends. Beverly Lewis then said that she had a friend, the

defendant, who might also be interested in such an arrangement. Beverly Lewis then "mentioned this" to defendant, who said that he would like to talk to Mrs. Marshall. At that time defendant frequently went to the horse races and was considering buying a racehorse "outright."

Beverly Lewis then called Mrs. Marshall and arranged a meeting with defendant. At that meeting Mrs. Marshall explained the arrangement to defendant. They then discussed which horses were "available" and the cost of training and keeping the horses for racing. The horses were then colts. Mrs. Marshall told defendant that he could have "his choice" under an arrangement "of the same type" as the one with the attorney and his friends. She gave defendant the names of three horses, but said that her husband was a better "horse judge" and might have different ideas.

At a subsequent meeting between defendant and Mrs. Marshall, also arranged by Beverly Lewis, he said that he was "interested." Mrs. Marshall then said that he could talk to her husband by telephone, which he then did. Mr. Marshall suggested the names of the two horses that he thought were the "best." Defendant then decided to enter into an agreement under which he would pay for training, feeding and other expenses for those two horses until the end of 1974 in return for one-third interest in the horses and one-third of their racetrack "earnings" during 1973 and 1974. It was also understood that the horses were to be sent on to west coast tracks for racing. Plaintiffs expressly retained the right to control the "care" and "activities" of the horses. On June 18, 1973, a letter agreement confirming this understanding was prepared by plaintiffs' attorney and signed by plaintiffs and defendant. Defendant testified that Mrs. Marshall told him that the horses "would be running in October or November." This was denied by her.

In July the two horses were sent to California for training. Defendant paid the "bills" for the two horses

until December 1, 1973, but not after that date. Both horses had been previously injured and neither raced in 1973.

Meanwhile, and at the time of the agreement between plaintiffs and defendant, the horse that was the subject of the original agreement with plaintiffs' attorney and his friends had been sent to California for training. At some undisclosed time defendant also acquired an "interest" in that horse and, in return, made payments to plaintiffs on billings for part of its expenses. Bills for expenses of all three horses were paid from a single checking account and payments by defendant and by plaintiffs' attorney to reimburse plaintiffs for such expenses were deposited in that same account.

Also in the meantime, and at defendant's suggestion, Mrs. Marshall talked to a Dr. Viets about the "possibility" of entering into a similar agreement involving another horse owned by plaintiffs. At the suggestion of Dr. Viets, she had a similar conversation with a Pat Kittridge. However, no contract was made with either of them.

Plaintiffs testified that prior to the time of the contract with defendant the two horses had been advertised for sale and that plaintiffs would not have raced them, but would have sold them, had defendant not entered into the contract. It is conceded that the contract was not registered with the Oregon Corporation Commissioner under ORS 59.055.

After unsuccessful negotiations between plaintiffs and defendant, plaintiffs filed this action for amounts due under the contract and defendant filed an affirmative defense and counterclaim under the Oregon Securities Law.

■ *The contract was an "investment contract" and the transaction was a "sale" of a "security."*

ORS 59.015(13)(a) defines the term "security" for the purposes of the Oregon Securities Law to include

[ 451 ]

an "investment contract." The most common definition of an "investment contract" is that adopted by the Supreme Court of the United States in *Securities & Exchange Comm. v. W. J. Howey Co.,* 328 US 293, 298-99 (1945), as follows:

"* * * [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. * * *."[1]

Although not expressly adopting the *Howey* definition, this court has held that a contract under which one person entrusts money to another with the expectation of deriving a profit to be created through the efforts of other persons is an "investment contract" for the purposes of the Oregon Securities Law.[2] That test is satisfied in this case because it is clear from the facts that the defendant agreed to pay money to the plaintiffs with the expectation of deriving a profit to be created solely through the efforts of other persons. Accordingly, we need not consider in this case whether other tests, such as the "risk-capital" test, may also be applied under appropriate circumstances.[3]

It is contended by the dissent that the sale of a fractional interest in a racehorse is not the sale of a "security" within the intended meaning of ORS 59.015(13)(a); that the "primary purpose of the Blue Sky Law is to * * * prevent * * * the sale of fraudu-

[1] *See also* Annot., 47 ALR3d 1375, 1380 (1973), and 1 Loss, Securities Regulation, 483 ff. (2d ed 1961).

[2] *State v. Simons and Blanchard,* 193 Or 274, 290, 238 P2d 247 (1951). *See also Bergquist v. International Realty,* 272 Or 416, 423-27, 537 P2d 553 (1975), and *State v. Consumer Business System,* 5 Or App 19, 28-29, 482 P2d 549 (1971). *Cf. Union Land Associates v. Ussher,* 174 Or 453, 458, 149 P2d 568 (1944), and *Sperry & Hutchinson Co. v. Hudson et al,* 190 Or 458, 468, 226 P2d 501 (1951).

[3] *See Bergquist v. International Realty,* 272 Or 416, 425-27, 537 P2d 553 (1975), and *State v. Consumer Business System,* 5 Or App 19, 25-29, 482 P2d 549 (1971).

lent and worthless corporate or quasi-corporate stocks and securities," and that "it is going to be a shock to a rancher" to learn that the sale of a "fractional interest in a horse or a registered bull" is subject to the provisions of that law.

■ While we may sympathize with these plaintiffs, such "shocks" are by no means uncommon to many in this day of constantly proliferating laws. As previously noted, the definition of the term "security," in ORS 59.015(13)(a) includes not only "stocks" and "bonds," but also "investment contracts" and "evidence of indebtedness," among other things. We must also remember, as recognized by the dissent and as previously held by this court, that the Oregon Securities Law must be "liberally construed to afford the greatest possible protection to the public."[4]

■ Consistent with that view, we have held that good faith and even reliance upon advice of counsel is not a defense[5] and that knowledge of the violation by the person making the sale is not a necessary element of liability because otherwise evasion of the statute would be easily accomplished, thus depriving it of much of its practical effect.[6] We have previously recognized in cases involving the question of whether various types of transactions are subject to the Oregon Securities Law that there is "* * * a certain class of gentleman * * * [who] 'toil not neither do they spin,' "

[4] *Adamson v. Lang,* 236 Or 511, 516, 389 P2d 39 (1964). To the same effect, *see Bergquist v. International Realty, supra* note 3, at 423; *Day v. Saunders,* 270 Or 432, 434, 528 P2d 513 (1974); *Adams v. American Western Securities,* 265 Or 514, 524, 510 P2d 838 (1973); *Gonia v. E.I. Hagen Co.,* 251 Or 1, 3, 443 P2d 634 (1968); *State v. March,* 247 Or 266, 268, 428 P2d 894 (1967); *Spears v. Lawrence Sec., Inc.,* 239 Or 583, 585, 399 P2d 348 (1965); *State v. Simons and Blanchard,* 193 Or 274, 289, 238 P2d 247 (1951); *Union Land Associates v. Ussher,* 174 Or 453, 457, 149 P2d 568 (1944); *New Amsterdam Co. v. Hyde,* 148 Or 229, 239, 34 P2d 930, 35 P2d 980 (1934). *Cf. State v. Whiteaker et al,* 118 Or 656, 661, 247 P 1077, 1079 (1926).

[5] *State v. Whiteaker et al,* 118 Or 656, 664, 247 P 1077 (1926), and *Moe v. Coe,* 124 Or 436, 439, 263 P 925 (1928).

[6] *Spears v. Lawrence Sec., Inc.,* 239 Or 583, 586-87, 399 P2d 348 (1965). *See also Gonia v. E.I. Hagen Co.,* 251 Or 1, 7, 443 P2d 634 (1968).

but who "lie awake nights endeavoring to conceive some devious and shadowy way of evading the law."[7]

Were we to hold, as urged by the dissent, that the Oregon Securities Law was not intended to apply to the sale of a "fractional interest in a horse or a registered bull," we could hardly distinguish sales of fractional interests in other personal property when, as in this case, the purchasers expect to derive a profit to be created solely through the efforts of other persons. The rule which we adopt in this case must be one which does not open up new areas for possible evasion of that law and must also be one which will apply alike to unsophisticated ranchers in the sale of "fractional interests" in registered bulls and to sophisticated promoters in the so-called "syndication" of racehorses. Indeed, it has been said that so-called "syndication of animals" has "exploded into celebrity with the now famous six-million dollar agreement involving Triple Crown Winner Secretariat."[8]

According to 1 Loss, Securities Regulation 489-90 (2d ed 1961):

> "Other schemes which have been held with almost monotonous consistency to involve 'investment contracts' and similar 'securities' are based on a purported sale or lease of some form of tangible property subject to an arrangement whereby the seller retains possession and control of the property with a view to earning a profit for the nominal owners or lessees. The catalogue of these schemes is as variegated as the imaginations of promoters. *Many of them involve animals,* preferably of either a fecund or a fur-bearing variety. * * *" (Emphasis added)

To the same effect, it is stated in 69 Am Jur 2d 1091, Securites Regulation-State § 28 (1973), that:

> "* * * One type of transaction commonly found to be

---

[7] *Bergquist v. International Realty,* 272 Or 416, 424-25, 537 P2d 553 (1975), quoting *Sperry & Hutchinson Co. v. Hudson et al,* 190 Or 458, 468-69, 226 P2d 501 (1951); and *State v. Whiteaker et al, supra* note 5, at 661.

[8] Note 62 Ky LJ 1038 (1974).

a security under the blue sky laws, often as a type of investment contract, is a transaction in which real or personal property purportedly is sold, but where the 'seller' in fact retains possession and control of such property and the 'buyer' obtains the right to receive profits resulting from the management of it. Such an arrangement might take any of a great number of possible forms as to details. * * * *Another form which such an arrangement may take involves the breeding or ranching of animals.* For example, the arrangement may purport to call for the sale of certain fur-bearing animals, with the seller to retain possession and responsibility for raising the animals, with no provision being made for segregation or identification of the animals supposedly sold, and with the 'buyer' to be entitled to certain skins upon maturity of the animals. In such arrangement, the 'buyer,' or investor, depends entirely upon the efforts of the 'seller' for a return upon his investment, and the arrangement is a security. * * * *"[9] (Emphasis added)

■ For these reasons, and based upon these authorities, we hold that the sale of a "fractional interest" in a racehorse is an "investment contract" within the intended meaning of ORS 59.015(13)(a) when the purchaser expects to derive a profit to be created solely through the efforts of other persons.

Plaintiffs make the further contentions that the trial court properly found that this transaction was not the sale or attempted sale of a "security" within ORS

[9]For a case holding that "cattle care contracts" are "investment contracts" when the purchasers of such contracts become "passive investors providing risk capital" for the operation of a ranch in Oregon, depending upon the skill of the rancher in the raising and marketing of the cattle for any return on their investment," *see People v. Witzerman,* 29 Cal App 3d 169, 177, 105 Cal Rptr 284, 290 (1972). See also cases cited in 1 Loss, Securities Regulation 490 n.88 (2d ed 1961), and 4 Loss, Securities Regulation 2502 (Supp to 2d ed 1969), involving cattle, foxes, chinchillas, muskrats and rabbits, and Rowand, More City Investors Profit From Cattle They've Never Seen, Wall St J, p 1, col 4, p 11, col 3 (Sept 28, 1959), as cited in 1 Loss, Securities Regulation, 490 n.88 (2d ed 1961).

*Cf. State v. Simons and Blanchard,* 193 Or 274, 238 P2d 247 (1951), holding that "certificates of ownership" of oil properties were "securities" under the facts of that case, and *Bergquist v. International Realty,* 272 Or 416, 537 P2d 553 (1975), holding that the sale of a partial interest in an apartment complex was the sale of a "security."

ch 59, because the evidence shows that defendant "induced" the transaction and did so "with open eyes and with knowledge of the risk involved" and because "[i]n all Oregon cases involving alleged violations of the Blue Sky Law, there has been some affirmative effort on the part of the seller which does not exist in this case."

In considering these contentions we note the extremely broad and all-inclusive definition of the term "sale," as set forth in ORS 59.015(11)(a) to include, among other things, "every disposition" or "contract to sell" a security.[10]

We have held that the fact that the purchaser of a "security" is "possessed of business experience" so as to know that he is "acquiring a mere gambler's chance" is no defense[11] and that there is more reason for application of the "Blue Sky Law" to "unorganized business concerns than to those having a recognized legal entity."[12]

We also believe that if a contract is an "investment contract," as we hold this contract to be, it is subject to the registration requirements of the Oregon Securities Law, ORS 59.055, regardless of whether the transaction was "induced" by an experienced and knowledgeable purchaser. Plaintiffs have cited no cases holding that such a transaction is not subject to such a statute if it is "induced" by such a purchaser.

In our best judgment it would be inconsistent with our previously announced purpose to construe the broad terms of the Oregon Securities Law "liberally," so as to "afford the greatest possible protection to the public," to hold, as plaintiffs urge, that this transaction was not the "sale" of a "security" because there was evidence from which the trial court could find that

[10] *See also State v. Simons and Blanchard,* 193 Or 274, 280, 238 P2d 247 (1951).

[11] *Moe v. Coe, supra* note 5, at 438.

[12] *State v. Whiteaker, supra* note 4, at 661-62, and *State v. Gerritson et al,* 124 Or 525, 529, 265 P 422 (1928).

defendant "induced" plaintiffs to enter into the transaction and that defendant did so "with open eyes and with knowledge of the risk involved."

■ As for plaintiffs' further contention that in all previous cases involving violations of the Oregon Securities Law "there has been some affirmative effort on the part of the seller," we would point out that even if this transaction were "induced by defendant," the evidence was undisputed that both of the plaintiffs engaged in at least "some affirmative effort" to close the transaction. Not only did they both sign the written contract, but it was prepared by plaintiffs' attorney. In addition, Mrs. Marshall met twice with defendant and explained the terms of the arrangement made previously with other persons relating to another horse and Mr. Marshall gave defendant the names of the two horses he thought to be "best" for the purposes of such an arrangement. This was not a case in which a seller was approached by a purchaser with a contract already prepared by the purchaser or with definite terms to propose to the seller, leaving the seller to only sign his name on the contract or accept such terms to complete the transaction, without "affirmative effort on the part of the seller."

For these reasons we hold that the trial court erred in "find[ing] that the Oregon Securities Laws do not apply" in that "[t]here was no sale nor any attempt to sell securities in this case." It follows that the judgment of the trial court must be reversed unless this transaction comes within one of the exemptions provided by that law, as also contended by plaintiffs.

*The transaction was not exempt as an "isolated transaction" or as an "initial sale."*

Plaintiffs contend that even if this transaction were an "investment contract," it was nevertheless exempt from registration under the Oregon Securities Law as an "isolated transaction" under ORS 59.035(2) or as an "initial sale" under ORS 59.035(11).

Defendant not only denies that either of these exemptions is applicable, but contends that the trial court erred in receiving evidence in support of such a contention over defendant's objection that plaintiffs had not pleaded such exemptions.

In response, plaintiffs say that counsel for defendant, after making that objection, told the trial court that "if the Court, of course, wants to hear the evidence in [sic] reserve ruling, that's fine"; that the trial court, although overruling the objection, later suggested that defendant's brief include that question, among others, in post-trial memoranda, but that defendant did not do so; that even though they had the burden of proof plaintiffs were entitled to offer such evidence under a general denial if defendant was not prejudiced, and that defendant in fact suffered no prejudice in this case.

■ We agree with defendant's contention that one who relies upon an exemption from the registration provisions of the Oregon Securities Law must plead such exemptions as an affirmative defense. ORS 59.275 specifically provides that "* * * the burden of proof of any exemption shall be upon the party claiming the benefit of such exemption, * * *." By the same token, the burden of pleading the exemption is also upon the plaintiffs.[13]

It may be that once defendant had made a proper and sufficient objection to plaintiffs' offer of evidence and once the trial court had overruled that objection, as in this case, defendant did not waive that objection by saying that if the court wanted to hear the evidence and reserve ruling, that would be "fine," or by failure to brief the question, as suggested by the trial court at the conclusion of the trial. We need not decide that question in this case, however, because we have examined the evidence offered by plaintiffs in support of their claims of exemption and find that they failed .

---

[13] 1 Loss, Securities Regulation, *supra* n.1, at 712. *Cf. Moe v. Alsop,* 189 Or 59, 65, 216 P2d 686 (1950).

to sustain their burden of proof to establish either exemption.

*—Exemption for "isolated transactions."*

ORS 59.035 provides an exemption from registration of securities for:

"(2) An isolated transaction not in the course of repeated and successive transactions in this state."

Plaintiffs contend that in the application of this exemption the court can consider only "transactions" relating to the two horses that were the subject of this agreement; that transactions relating to other horses cannot be considered, and that even if they could be properly considered plaintiffs had no "general purpose" because "here the buyer approached the vendor."

■ We have held that sales of stock to three, and perhaps even as few as two, different individuals may be "repeated and successive transactions," so as not to qualify within this exemption.[14] We believe that the proper test to be applied in such a case is whether the sales in question are made "within a period of such reasonable time as to indicate that one general purpose actuates the vendor and that the sales are not so detached and separated as to form no part of a single plan."[15]

In this case it appears that in February 1973 plaintiffs sold a one-half interest in one horse to plaintiffs' attorney and three of his friends, with a one-eighth interest in that horse to each of the four of them, under substantially the same terms of agree-

---

[14] *See Tarsia v. Nick's Laundry Co.,* 239 Or 562, 565-66, 399 P2d 28 (1965), including dissenting opinion by O'Connell, J.; *Thorson v. Richmond,* 267 Or 586, 590, 518 P2d 642 (1974), and *Day v. Saunders,* 270 Or 432, 442, 528 P2d 513 (1974). *See also Koeneke, Hart v. B & O Lbr. Co.,* 224 Or 241, 243, 356 P2d 149 (1960).

[15] *Kneeland v. Emerton,* 280 Mass 371, 183 NE 155, 163; 87 ALR 1 (1932), quoted with approval in *Anderson v. Mikel Drilling Co.,* 257 Minn 487, 102 NW2d 293, 297-98 (1960); *Gales v. Weldon,* 282 SW2d 522, 526 (Mo 1955), and in dissenting opinion in *Tarsia v. Nick's Laundry Co.,* 239 Or 562, 567 n.1, 399 P2d 28 (1965). *See also Thorson v. Richmond,* 267 Or 586, 590, 518 P2d 642 (1974). *Cf. Day v. Saunders,* 270 Or 432, 442, 528 P2d 513 (1974).

ment as those of the subsequent sale to defendant in June 1973 of an interest in two other horses—the sale which is the subject of this case. In addition, Mrs. Marshall discussed with Dr. Viets and Pat Kittridge at least the "possibility" of similar agreements with them relating to other horses at about the same time as the sale to defendant.

Assuming that plaintiffs made no "attempt or offer to sell" to Dr. Viets and Pat Kittridge,[16] and considering only the sales to plaintiffs' attorney and his three friends and the sale to defendant, we hold that these transactions must be considered together for the purpose of determining the application of this exemption, even though not involving the same horses and regardless of whether the buyers "approached" the vendor. We also hold that under the evidence in this case the trier of the facts could have found that these transactions were made within such "reasonable time" as to indicate that one general purpose "actuated" the plaintiffs and that plaintiffs failed to prove that they were "not so detached and separated as to form no part of a single plan." It follows, in our judgment, that plaintiffs did not sustain their burden to prove that the sale to defendant was exempt as an "isolated transaction not in the course of repeated and successive transactions in this state," within the meaning of ORS 59.035(2).

*—Exemption as an "initial sale."*

ORS 59.035(11) provides a further exemption for

"(11) The initial sale of any securities of a new organization by preorganization subscription or by subscription after organization but before the commencement of any business activity, if:

"(a) The number of persons solicited within this state does not exceed 25, and the number of persons purchasing the securities within or without this state does not exceed 10;

---

[16] Under the terms of ORS 59.015(11) an "attempt to offer to sell" is a "sale" for the purposes of the Oregon Securities Law.

"(b) No commission or other remuneration is paid or given directly or indirectly in connection with the sale; and

"(c) The sale is not a part of an attempt to evade the provisions of the Oregon Securities Law."

Plaintiffs offered evidence sufficient to satisfy the requirements of subparagraphs (a), (b) and (c), but the question remains whether, as contended by plaintiffs, the sale to defendant was "the initial sale" of securities of a "new organization" by "subscription after organization but before the commencement of any business activity."[17]

Again, plaintiffs contend that in deciding this question the transaction between plaintiffs and defendant involving two of plaintiffs' horses must be considered separately from the previous transactions with plaintiffs' attorney and his friends involving another horse. We believe, however, that in considering the exemption for an "initial sale," under the record in this case, as well as in considering the exemption for "isolated transactions," the transaction involving the sale to defendant of an interest in two horses cannot properly be separated from the prior transactions involving the sale to plaintiffs' attorney and his friends of an interest in one other horse. We find, after reviewing the record, that plaintiffs failed to sustain their burden to prove that for accounting or other business purposes these transactions were, in fact, treated as separate and distinct business "organization[s]" or entities. On the contrary, there was evidence that payment of bills for the expenses incurred by all three horses subject to these transactions were paid by plaintiffs by checks drawn on a single checking account. It also appears checks in payment for reimbursement of such expenses as received from defendant and also from plaintiffs' attorney for expenses incurred by the other horse were

---

[17] No contention is made by plaintiffs that the sale in this case qualifies as a "preorganization subscription" within the meaning of ORS 59.035(11).

all deposited in this same account and that this was "the same account that [plaintiffs] operated the ranch with."

Plaintiffs also contend that even "if all of these transactions involving race horses are treated as a single business," the exemption still applies because "there had been no business activity by the race horses." We find, however, after reviewing the record, that although it is true that none of the three horses subject to these transactions had actually raced until October 1973, long after the sale by plaintiffs to defendant in June 1973, plaintiffs failed to sustain their burden to prove that this sale was made "before the commencement of any business activity." On the contrary, there was evidence that prior to June 1973 the horse subject to the transactions with plaintiffs' attorney and his friends had been sent to California for training in preparation for racing and that expenses for that purpose had been incurred prior to June 1973.

This result is consistent with our holding in *Day v. Saunders,* 270 Or 432, 441, 528 P2d 513 (1974), in which we held that the incurring and payment of expenses for office rent, supplies, printing and advertising prior to the date of the sale of securities in that case constituted the "commencement of * * * business activity" by a "new organization" for the purposes of this exemption.

For all of these reasons, the judgment of the trial court must be reversed and this case remanded with instructions to enter judgment in favor of defendant on his counterclaim against plaintiffs in the sum of $3,358, representing reimbursement of the amounts paid by him to plaintiffs under the terms of an "investment contract" which was not registered as required by the Oregon Securities Law.

Reversed and remanded.

**HOWELL, J.,** dissenting.

I agree that this court has held that the Oregon Securities Law must be liberally construed to protect the public. However, I do not believe that the sales by a rancher of a fractional interest in three different horses constitute "sales" within the purview of ORS 59.015 et seq.

The statute defining a security, ORS 59.015(13)(a), sets forth a list of obvious securities, such as "stock," "bond," "debenture," and, "in general, any interest or instrument commonly known as a 'security'."

In *Sperry & Hutchinson Co. v. Hudson et al.,* 190 Or 458, 226 P2d 501 (1951), we stated:

"The primary purpose of the Blue Sky Law is to protect investors and prevent, so far as possible, the sale of fraudulent and worthless corporate or quasi-corporate stocks and securities, and to regulate the sale of such securities. * * *" 190 Or at 467.

It is going to be a shock to a rancher who sells a fractional interest in a horse or a registered bull to his neighbors to learn that his sale is considered in the same category as the sale of a worthless corporate stock or security and subject to the Blue Sky Law.

I do not believe the legislature intended the plaintiffs' sale in the case at bar to be subject to the Oregon Securities Law, and I would affirm.