Argued December 19, 1950; affirmed January 17, 1951

# THE SPERRY and HUTCHINSON COMPANY, a corp., v. HUDSON, Corporation Commissioner, et al.

226 P. (2d) 501

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In Banc.

*Thomas C. Stacer*, Assistant Attorney General, of Salem, argued the cause for appellants. With him on the brief was George Neuner, Attorney General, of Salem.

*R. R. Bullivant* argued the cause for respondent. On the brief were Freed & Failing; Pendergrass, Spackman & Bullivant, all of Portland; Charles Wesley Dunn; Casey, Beinecke & Chase, all of New York.

TOOZE, J.

By this suit, The Sperry and Hutchinson Company, a New Jersey corporation, licensed to do business in Oregon, as plaintiff, seeks an injunction against Maurice Hudson, Corporation Commissioner of the State of Oregon, and George Neuner, Attorney General of the State of Oregon, as defendants, to restrain the attempted enforcement by defendants of the Oregon Securities Law (more commonly known as the "Blue Sky Law") against the trading stamp plan operated by plaintiff; also, to obtain a declaratory judgment that such trading stamp plan, or any part thereof, is

not a "security" within the meaning of Oregon's Blue Sky Law. §§ 80-101 to 80-131, O. C. L. A., as amended.

The lower court entered a decree that plaintiff's trading stamp system, and the various portions thereof, are not subject to the provisions of the Blue Sky Law, and that neither said trading stamp system, nor any part thereof, is a "security" within the meaning of such law, and registration under the law is not required; also, a decree permanently enjoining the defendants from enforcing or attempting to enforce any of the provisions of said law against the plaintiff with respect to its trading stamp system. From this decree, the defendants appeal.

The plaintiff was incorporated under the laws of New Jersey in 1900, and, in 1905, it was first authorized to transact business in the state of Oregon, and since that time has continuously carried on its operations in this state. Its principal office is located in New York City, but it maintains offices in the several states in which it does business.

The business of plaintiff consists in the licensing and operation of a trading stamp system. Retail merchants are licensed to make use of the plan. All types of retail outlets are among its customers. In Oregon, approximately 1300 merchants make use of the system, and in the nation at large, some 24,000. These include auto dealers, drug stores, grocery stores, hardware stores, jewelry stores, gas service stations, variety stores, department stores, florists, and others.

Basically, the plan operated by plaintiff is a cash discount system. It is but one among many systems employed by retail merchants to increase trade, encourage cash transactions, and build up good will, all of them termed generally as "trade stimulators."

As the basis of its system and the operation thereof, plaintiff first enters into a written contract with the merchant. In this contract plaintiff is designated as the "Licensor" and the merchant, as the "Licensee."

Under this contract the plaintiff agrees: to license and authorize the merchant to install and use in connection with his business the plaintiff's "Cooperative Cash Discount System," and to use its "S. & H. Cooperative Discount Stamps" as cash discount symbols or tokens in carrying out the plan; to print the name and business address of the Licensee in any directory of merchants using its system issued and distributed in the city; to furnish Licensee with advertising signs for use inside and outside his store to make known to the public that he has adopted plaintiff's system; to furnish Licensee with its cash discount symbols or tokens in the form of S. & H. trading stamps; to furnish for distribution its merchandise redemption catalogues and its stamp books, in which customers of the merchant may paste and accumulate said stamps; and to redeem the said stamps by giving in exchange therefor merchandise of the customers' selections, as described in said catalogues and subject to the conditions printed in the catalogues and stamp books.

On his part, the merchant, as Licensee, agrees: to adopt and use plaintiff's system, including its cash discount symbols or tokens furnished for use during the term of the agreement; to advertise the adoption and use of plaintiff's system by window displays and other displays in and about the store, using such advertising signs as shall be furnished by plaintiff from time to time; and also, to advertise the fact of the use of such system in all newspaper or other advertisements published by or for him; to order and receive from

plaintiff its said cash discount symbols or tokens in certain specified lots, the lots consisting of pads, each pad containing 5000 stamps; to pay the plaintiff for the use of its system an amount measured by the number of pads of stamps ordered and delivered at the rate of $15.00 per pad, payable on delivery of same; to offer said stamps to all customers who make cash payments, and when accepted by the customers, to issue to them one of said stamps for each ten cents, represented in such payments, as a discount in consideration of the payment of cash when made either C. O. D. or, at the option of the merchant, on or before the 15th proximo, and only for redemption by the plaintiff; not to sell or dispose of the plaintiff's stamps in any manner except as provided in the contract.

Both parties to the contract mutually agree that the property in and title to said stamps and advertising shall remain in plaintiff and shall not, in any event, pass to the merchant or any other person, firm, or corporation; that upon termination of the contract, the merchant shall cease to use any unissued stamps then remaining in his hands and shall return to plaintiff all advertising signs and all of said unused stamps; and plaintiff agrees to repay the merchant any amount theretofore paid by him for its services and use of its system, measured by the number of stamps remaining unissued and so returned, provided same are undetached from the original pads, and the merchant shall inform his customers that any stamps theretofore issued by him and then outstanding will be redeemed by the plaintiff.

The trading stamp in question is green in color and about one-half the size of an ordinary postage stamp; on the face of it is printed the legend: "Sperry and

Hutchinson Co-operative Discount Stamp—10"; also, as indicated upon the sample in evidence, certain identification letters and numbers appear, printed in red. The reverse side of the stamp bears no writing, but is glued for use in pasting in the stamp savings book.

The stamp savings book is merely a convenient method adopted for preserving the stamps and for redemption purposes. It consists of 40 pages, exclusive of cover, and each page is designed for pasting 30 stamps. One thousand two hundred stamps, therefore, complete the book, and for redemption, completed books are the medium used for determining the merchandise to which the customer is entitled. On the inside of the cover page is printed a notice to collectors of stamps. They are advised that neither the stamps nor the books are sold to merchants, collectors, or any other persons, and that title thereto remains in plaintiff; that the stamps are issued as evidence of cash payment to the merchants issuing same; that the only right the collector acquires in said stamps is to paste them in the book and present them for redemption; that they are not transferable except with the written consent of plaintiff; that to prevent their further use, they must be pasted in the book.

The catalogue issued by plaintiff describes the several articles of merchandise available for redemption purposes, each article requiring one or more books or parts of books of stamps. This catalogue is changed from time to time. On the inside of the back cover page are printed instructions respecting redemption, and containing the statement: "Because of changing market conditions over which we have no control, we reserve the right to increase or decrease the number of S. & H. Green Stamp books required or to withdraw any article

without notice. Should you, for reasons above, order any article which we cannot supply as listed, we will notify you of this fact so that another selection may be made. We always advise a first and second choice."

In a practical sense, the issuance of these trading stamps to cash customers is simply a method adopted for giving these purchasers a discount for cash. By the use of these stamps discounts are available on small purchases. As explained by the witness Shirer, vice president of plaintiff corporation: "There is no coin small enough to give a discount on a ten or fifteen cent purchase." By the issuance of one of these stamps for each ten cent purchase, such a discount is made possible.

In the operation of plaintiff's system, merchandise sold to cash customers is at the regular, established retail prices, the purchaser paying for each article of merchandise the same price required to be paid by those buying on credit. Of course, the primary purpose of this discount system is to encourage cash transactions. It is unnecessary to detail the many advantages accruing to the merchant from cash dealings. To give a discount for cash payments is a long-established mercantile practice. The manufacturer allows such discount to the jobber and wholesaler, and the jobber and wholesaler, to the retailer. To pass this on to the customer of the retailer is but providing a benefit to him who, in the last analysis, pays all bills.

It is the contention of defendants that this system as outlined, particularly the written contract thereunder, is within the definition of "security" as set out in § 80-102, O. C. L. A., as amended.

Section 80-102, O. C. L. A., as amended by ch. 148, Oregon Laws, 1941, provides:

"Sec. 80-102. When used in this act the following terms shall, unless the text otherwise indicates, have the following respective meanings:

"(a) 'Security' shall include any note; stock; treasury stock; bond; debenture; *evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement;* collateral-trust certificate; preorganization certificate, receipt, or subscription; transferable share; *investment contract;* voting trust certificate; certificate of deposit for a security; fractional undivided interest in, any oil, gas or mining lease, royalty or deed; *or, in general, any interest or instrument commonly known as a 'security',* or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing." (Italics ours.)

■ In *Union Land Associates v. Ussher,* 174 Or. 453, 149 P. (2d) 568, this court very tersely states the purpose of the Blue Sky Law. In that case, the court, at page 457, said:

"The Blue Sky Law was enacted for the protection of the public and, to effectuate such purpose, it should be liberally construed. New Amsterdam Casualty Co. v. Hyde, 148 Or. 229, 34 P. (2d) 930, 35 P. (2d) 980; State v. Whiteaker, 118 Or. 656, 247 P. 1077; Moe v. Coe, 124 Or. 436, 263 P. 925. *It was not intended, however, to regulate every commercial transaction or investment.* Neither is it within the purview of the act to control the sale of all securities: State v. Whiteaker, supra; 37 C. J. 275, Licenses § 168. * * *" (Italics ours.)

Defendants contend that plaintiff's system comes within the following terms of the statutory definition

of "security" hereinabove set forth: (a) "evidence of indebtedness"; (b) "certificate of interest or participation in any profit-sharing agreement"; (c) "investment contract"; (d) "or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing."

■ The primary purpose of the Blue Sky Law is to protect investors and prevent, so far as possible, the sale of fraudulent and worthless corporate or quasi-corporate stocks and securities, and to regulate the sale of such securities. 37 C. J., Licenses, 271, § 164.

In construing § 80-102, O. C. L. A., this purpose must be kept in mind.

In the foregoing definition of "security," there are set forth certain definite terms such as "note," "stock," "treasury stock," "bond," "debenture," "collateral-trust certificate," "transferable share," "investment contract," and other similar designations, followed by the language: *"or, in general, any interest or instrument commonly known as a 'security.'"* (Italics ours.)

■ The use of these general words at the end of the definition was clearly intended to explain and qualify the meaning to be given the specific terms immediately preceding. In other words, the act is intended to cover any interest or instrument such as those specifically named and others which are commonly known as "securities." 59 C. J., Statutes, 980, § 580. The name given the act, to-wit: "The Oregon Securities Law," supports this conclusion. It is a law dealing with

"securities" in the commonly accepted sense of that term.

In 37 C. J., Licenses, 275, § 168, cited with approval by this court in *Union Land Associates v. Ussher,* supra, the term "securities" is defined as follows:

> "The term 'securities,' as used in these laws [Blue Sky Laws], means written assurances for the return or payment of money, evidences of indebtedness, except where special definitions are given by the statutes. * * * *It means the investment of funds in a* designated portion of the assets and capital of a concern, *with a view of receiving a profit through the efforts of others than the investor;* and in this sense includes what are termed 'security' or 'investment' contracts or 'speculative securities.' *But it does not extend to ordinary commercial contracts,* nor does it include interest income from the lending of money, *or the profits which one might make by his own efforts as the result of an ordinary commercial contract.* * * *"
> (Italics ours.)

It would not only be inadvisable, but also impossible to lay down a fixed rule for determining in every case that might arise just what is or is not a "security" within the meaning of the Blue Sky Law. As was said by the late Mr. Justice BELT in *State v. Whiteaker et al.,* supra, at page 661:

> "We do not deem it advisable to lay down any hard-and-fast rule to determine whether similar offerings to the public may be sold without a license. Were we to do so, a certain class of gentlemen of the 'J. Rufus Wallingford' type—'they toil not neither do they spin'—would lie awake nights endeavoring to conceive some devious and shadowy way of evading the law. It is more advisable to deal with each case as it arises. * * *"

■ The terms "evidence of indebtedness," "certificate of interest or participation in any profit-sharing agreement," and "investment contract" as used in the act refer only to such of those types as are commonly known as "securities"; they contemplate the presence of the investment process, that is, "the investment of funds * * * with a view of receiving a profit through the efforts of others than the investor." 37 C. J., Licenses, 275, § 168; 47 Am. Jur., Securities Acts, 575, § 16; *State v. Whiteaker et al.,* supra; *Union Land Associates v. Ussher,* supra.

Let us briefly analyze the contract under discussion.

■ In effect, plaintiff has simply sold to the contracting merchant the use of its cash discount system and as an integral part of such sale and for the price stiplated in the contract has agreed to furnish all the tools necessary to its successful operation. These tools consist of (1) the trading stamp; (2) the stamp book; (3) the advertising signs; (4) the catalogue; and (5) the merchandise for redemptions. All these items, along with salaries, rentals, taxes, and other expenses of operation, constitute the costs incident to the conduct of plaintiff's business. These expenses of operation must be and are paid by plaintiff, whether or not it realizes an over-all profit in its business. *Whatever financial profit plaintiff does realize belongs to it alone. Neither the merchant nor the customer has any control over this profit, nor does either in any way share therein.* It is true that in a sense plaintiff, the merchant, and the customer profit from the operations carried on under the contract, but each profits in a different way. The plaintiff makes a definite financial profit if its income exceeds its expenses; the merchant profits from an

increase in patronage and the benefits derived from doing a cash business; the customer is benefited by receiving a discount on his cash purchases. *However, the benefit each enjoys is his alone, and the others in no way share therein.* The only true profit, as that term is understood in the world of finance, if there is a profit, is that enjoyed by plaintiff. The "profits" of the merchant and the customer might better be termed "benefits." These several benefits arising from the contractual relationship do not in any sense make this "a profit-sharing agreement" within the terms of the Blue Sky Law.

■ The trading stamp itself is merely the medium employed to evidence the fact that the customer has paid cash on his purchase and is therefore entitled to a discount; in other words, it is simply a discount memorandum. In and of itself it has no value, and it never becomes the property of any person other than plaintiff. To procure the stamp, the customer makes no investment. Neither has the merchant made any investment in the stamp as such or in any other of the tools employed in operating the system. *The merchant pays for services rendered by plaintiff.* Using the stamp pad as the basis for computing the amount the merchant is required to pay plaintiff for these services in no way alters the situation. This is but a method of bookkeeping. The merchant acquires no title to the stamps, nor has he any right of redemption. It is wholly immaterial that the discount given the customer by the merchant is handled by a third party instead of directly. This is but a part of the services the plaintiff undertakes to render and for which the merchant pays. The obligation of plaintiff in this respect is owed primarily to the merchant; not to the customer.

The trading stamp, therefore, is not "an evidence of indebtedness," as that term is used in the statute.

■ As noted, defendants also contend that this is an "investment contract." Obviously, the merchant does not "invest" in anything, nor does the customer, using the term "invest" in the sense it is used when applied to the purchase of "securities." It is perhaps true that in contracting with plaintiff for its services and agreeing to pay so much therefor, the merchant does so with the hope that he will profit thereby in the conduct of *his* retail business (not in the conduct of plaintiff's business); but this expectation on his part, or a realization of such expectation, cannot, and does not, alter the fundamental nature of the transaction. Under the contract the merchant has, in a sense, invested in services of a particular kind, just as he invests in other services, in merchandise, and in rent, taxes, insurance, light, power, fuel, and water, necessary to the conduct of his business. These things simply constitute his costs of doing business. If the contract in question may be deemed an "investment contract," then also all the other contracts into which the merchant enters and which are necessary to his operation must be considered as "investment contracts." It is very clear that in writing the definition of "securities" heretofore quoted the legislature had in mind no such absurd results. The contract in question is purely and simply "a contract for services," and is not an "investment contract."

■ In *Union Land Associates v. Ussher,* supra, at page 458, this court, in commenting on the term "investment contract" as used in § 80-102, O.C.L.A., said:

"The act fails, however, to define 'investment contract' but in other jurisdictions the term 'invest-

ment contract', as used in a 'blue sky law', has been defined as a *contract providing for the investment of capital in a way intending to secure income or profit* from its employment. * * *'' (Italics ours.)

■ Tested by the rules above set forth, the system operated by plaintiff does not come within the purview of the Blue Sky Law. It is an ordinary commercial transaction of the ''trade stimulator'' type, and is not a ''security'' subject to the regulatory provisions of the Blue Sky Law.

The decree is affirmed.