Argued December 16, 1970, reversed and remanded
March 11, 1971

# STATE OF OREGON EX REL HEALY ET AL, Appellants, v. CONSUMER BUSINESS SYSTEM, INC. ET AL, Respondents.

482 P2d 549

*Peter S. Herman*, Senior Counsel, Salem, argued the cause for appellants. With him on the briefs were Lee Johnson, Attorney General, Al J. Laue, Assistant Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

*Fred M. Aebi*, Portland, argued the cause for respondents. With him on the brief were McMurry, Sherry, Nichols & Cox, and Garry P. McMurry, Portland.

Before SCHWAB, Chief Judge, and LANGTRY, BRANCHFIELD,* and HOLMAN, Judges.

SCHWAB, C. J.

This is an appeal by the state of Oregon from a decree dismissing its complaint for injunctive relief. The state sought to have the court below enjoin defendants, a foreign corporation and its president, from selling franchise contracts, manager contracts and representative contracts which the state alleged constituted "investment contracts" and had not been registered as securities.

The question on appeal is whether the fran-

---

* Branchfield, J., did not participate in this decision.

chise agreements sold by defendants to members of the public constitute "investment contracts" required to be registered as a security under ORS ch 59.

Consumer Business System, Inc. (hereafter CBS), was incorporated in California on August 21, 1969, with $5,000 in cash. Defendant Jeanis is its president and a stockholder.

The company solicits agreements from various businesses in which the businesses agree with CBS to offer certain percentage discounts to all CBS subscribers who display the CBS card at the time of cash purchase. In turn, CBS agrees to list the services or products of the contracting business in the Consumer Buyer's Guide without charge. The discount requires a cash purchase. The record does not indicate that the contracting businesses agree not to give similar discounts to non-CBS subscribers.

A subscriber pays $50 for a "subscription" which is represented by the Consumer Buyer's Guide and his identification card which he uses to display to a participating business. The subscription is renewable yearly.

To solicit businesses for listing in the Consumer Buyer's Guide and sell subscriptions, defendants needed an organization. They created an organization of franchisees through "business interview meetings" at which they sold franchises by using commission income expectations. This income was to be generated by the sale of $50 subscriptions by the franchisees' organization of managers and representatives. However, the initial organization contained only franchisees, because until defendants developed the Consumer Buyer's Guide there was no attempt

or reason to bring in managers and representatives to sell subscriptions.

A franchisee is a person who builds an organization of managers and representatives. He receives $5 of every sale of a subscription made by a representative in his organization. If the franchisee himself makes the sale he keeps $30. A portion of every subscription sale goes to CBS. A franchise originally cost $1,055. That price was in effect when CBS moved into Oregon from Washington on August 26, 1969. Subsequently, CBS raised the price to $1,350 so that it could put on a stronger development program.

A manager is a person who has been selected by a franchisee. A manager is required to be a subscriber and to pay an additional $100 fee annually under the terms of a management contract. A manager may sell subscriptions at retail and earn a commission of $25 or he may employ representatives and make a $7 commission on each of their sales.

A representative is a person who sells "subscriptions" (the Consumer Buyer's Guide and identification card) to the public. He must first purchase a subscription, and sign a representative contract with the manager. He must pay $50 for the subscription and $5 to be a representative. These fees are payable annually. A representative receives a commission of $18 for each subscription he sells.

Either a franchisee, a manager or a representative can solicit businesses for listing in the Guide.

CBS, with $5,000 in capital, started operations in the state of Washington on August 21, 1969. At the time of trial in November 1969, it had a total of 43 franchisees and a directory of approximately 200 businesses for the state of Washington, with another

100 in the process of being added. It then had only a few managers and representatives in Washington and probably under 50 subscribers.

CBS commenced business in Oregon on August 26, 1969. By November of 1969, it had issued a total of 31 franchises. It had a few representatives and some managers. It had not over 10 or 15 subscribers. Its first Oregon Consumer Buyer's Guide contained approximately 103 businesses for the entire state. It was issued in October of 1969.

CBS's primary source of income was from the sale of franchises. The receipts received by the company from all of its operations were used for promoting its program and for operational expenses, including the payment of commissions. There was no attempt to allocate receipts received from franchisees in a particular state to the expenses incurred by the corporation in that state. Although it had 73 franchisees in Oregon and Washington alone, each of whom had paid $1,050 to $1,350, its cash balance at time of trial was only $20,000.

Some of CBS's activities in promoting its program were direct mailing to businesses, conducting of business interviews meetings to bring in new franchisees, appointment of the initial officers of the local association of franchisees, giving of financial support to the local association of franchisees, conducting training meetings for the local association of franchisees, providing advertising and public relations, mailing of identification cards, news letters and literature to new subscribers and annual billing of subscribers for renewal of subscriptions.

It is unlawful for any person to offer or sell any security in Oregon, unless the security is regis-

tered.[1] Registration insures that the proposed plan of business is fair and equitable,[2] that prospective investors are given full information as to the details of the scheme,[3] and that the issuer of the securities is solvent and in sound financial condition.[4]

An "investment contract" is a form of security which must be registered under Oregon law.[5] The term "investment contract" was defined by the United States Supreme Court in *S. E. C. v. Howey Co.*, 328 US 293, 298-99, 66 S Ct 1100, 90 L Ed 1244 (1945):

> "* * * [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise * * *."

The *Howey* definition of "investment contract" is basically the definition heretofore used by Oregon courts. See *Sperry & Hutchinson Co. v. Hudson et al*, 190 Or 458, 468, 226 P2d 501 (1951); *State v. Whiteaker et al*, 118 Or 656, 660, 247 P 1077 (1926). In order for a court to find an "investment contract" under the *Howey* test, two conditions must be satisfied: (1) a common enterprise must exist; and (2) hoped-for profits for the investor must result solely from the efforts of others.

The "common enterprise" test is obviously present here. The success of the individual franchises

[1] ORS 59.055.
[2] ORS 59.105 (1)(a).
[3] ORS 59.065 (1), 59.085 (1).
[4] ORS 59.105 (1)(b).
[5] ORS 59.015 (11)(a).

depends upon the Consumer Buyer's Guide which the franchisor must develop and upon the good will and reputation among the buying public developed by contact between all franchisees, managers and representatives and the public.

The second requirement of the test, that the investor's profits result "solely" from the efforts of others,[⊛] is not satisfied by the franchise agreement in this case. The franchisee earns profits by recruiting managers and representatives who sell memberships in CBS to the public. If a franchisee purchases a franchise, and then does nothing, it is understood that he will not make profits. If the *Howey* test is the only test to be used in determining whether a security exists in this case, we would agree with the court below that the state has not proved the existence of an "investment contract," because the franchisees do not depend solely upon the efforts of others for their profits.

The state urges the court to adopt an additional test for determining whether franchise agreements are "investment contracts." This test was first formulated in *Silver Hills Country Club v. Sobieski,*

---

[⊛] The word "solely" used in the definition of "investment contracts" cited in *Howey* has been liberally interpreted by the courts. Some courts have held that an "investment contract" exists when the investor has a choice between being an active or inactive participant in the enterprise. In these cases, the evidence usually shows that most investors were inactive. Continental Marketing Corp. v. Securities & Exchange Com'n, 387 F2d 466 (10th Cir 1967); United States v. Herr, 338 F2d 607 (7th Cir 1964). Other courts have found "investment contracts" when the investor has participated in the enterprise in only a nominal manner. Blackwell v. Bentsen, 203 F2d 690 (5th Cir 1953); see also Georgia Market Centers, Inc. v. Fortson, 225 Ga 854, 171 SE2d 620 at 623 (1969).

55 Cal2d 811, 13 Cal Rptr 186, 361 P2d 906 (1961), and is referred to as the *Silver Hills,* or "risk capital," test.[7]

*Silver Hills* involved a country club promotion. The promoter contracted to buy a 22-acre ranch for $75,000 to be used as the site. In order to finance this venture, the partners planned to sell numerous memberships. The total investment by the partnership was $400. The court said:

> "We have here nothing like the ordinary sale of a right to use existing facilities. *Petitioners are soliciting the risk capital with which to develop a business for profit.* The purchaser's risk is not lessened merely because the interest he purchases is labelled a membership. Only because he risks his capital along with other purchasers can there be any chance that the benefits of club membership will materialize." (Emphasis supplied.) 55 Cal2d at 815.

The court concluded that the purpose of the section of the California Corporation Code dealing with securities was "to afford those who risk their

---

[7] Florida courts, without mentioning *Silver Hills,* have declared an enterprise similar to the one in this case, to involve a sale of securities. Florida Discount Centers, Inc. v. Antinori, 226 So2d 693 (Fla App 1969), aff'd 232 So2d 17 (Fla 1970). An Hawaii case, State of Hawaii v. Hawaii Market Center, Inc., Circuit Court of the First Circuit, State of Hawaii (1969), which was not available to this court, is cited in Koscot Interplanetary, Inc. v. King, 452 SW2d 531 (Tex Civ App 1970), as following *Antinori.* Two other courts, in situations similar to that in the *Antinori* case, also without mentioning *Silver Hills,* have refused to find a security. Gallion v. Alabama Market Centers, Inc., 213 So2d 841 (Ala 1968); Georgia Market Centers, Inc. v. Fortson, supra, n 6. One federal court has discussed the *Silver Hills* test without adopting it in the particular circumstances. Mr. Steak, Inc. v. River City Steak, Inc., Civil Action C-1787 (D Colo, filed Sept. 30, 1970).

capital at least a fair chance of realizing their objectives in legitimate ventures * * *." 55 Cal2d at 815.

In June of 1967, the California Attorney General issued an opinion discussing whether a franchise arrangement constituted a security within the meaning of the California Corporate Securities Act in any of three situations.[9] In the third situation the franchisee participates actively in the franchised business and the franchisor agrees to provide certain goods and services to the franchisee. However, the franchisor intends to secure a substantial portion of the initial capital that is needed to provide such goods and services from the fees paid by the franchisee or franchisees. This situation is similar to the situation which exists in the case at bar.

The Attorney General stated that a security did exist in such a situation, because the solicitation of fees by the franchisor from the franchisees, in order to raise a substantial portion of his initial capitalization (i.e., his "risk capital"), created a situation analagous to the situation in *Silver Hills*. The Attorney General did not feel that the active participation of the franchisee in the franchised business

---

[9] 49 Op Att'y Gen 124 (Cal 1967). The first two situations were:

"(1) Where the franchisee participates only nominally in the franchised business in exchange for a share of the profits.

"(2) Where the franchisee participates actively in the franchised business and where the franchisor agrees to provide certain goods and services to the franchisee."

The Attorney General stated that a security did exist in situation one, because the franchisee's participation was only nominal. The opinion concluded that no security existed in situation two, because profits would be attributable to the franchisee's own efforts.

prevented the franchising agreement from being a security within the test of the *Silver Hills* case.

> "* * * In this franchise agreement the franchisee's only participation is in the franchised business that he himself operates. The risk capital, however, is provided by the franchisee to the franchisor to enable the franchisor to supply the franchisee with certain goods and services. This latter aspect seems to us to be a separate business risk apart from the success or failure of the franchisee's conduct of the franchised business * * *. [W]e believe that this accords with the intent of the parties: the incentive for franchise arrangements is to give the franchisee the status of an independent businessman apart from the franchisor. * * * [I]t would seem that the franchised business operated by the franchisee and the franchisor's business of supplying the franchisee with goods and services are separate 'business ventures' and that the venture in which the franchisee participates is not the same venture for which he supplies the risk capital * * *."[@]

Although the Oregon Supreme Court has heretofore used only the *Howey* test to define an "investment contract" the language of the court in *Sperry & Hutchinson Co. v. Hudson et al*, supra, indicates that the use of the *Howey* test should not foreclose the courts from using other methods of analysis when warranted.

> "It would not only be inadvisable, but also impossible to lay down a fixed rule for determining in every case that might arise just what is or is not a 'security' * * *. As was said by the late Mr. Justice BELT in *State v. Whiteaker, et al*, * * *:
>
> " 'We do not deem it advisable to lay down any hard-and-fast rule to determine whether similar

---

[@] 49 Op Att'y Gen 124, 128-29 (Cal 1967).

offerings to the public may be sold without a license. Were we to do so, a certain class of gentlemen of the "J. Rufus Wallingford" type—"they toil not neither do they spin"— would lie awake nights endeavoring to conceive some devious and shadowy way of evading the law. It is more advisable to deal with each case as it arises * * *.' " *Sperry & Hutchinson Co. v. Hudson et al*, 190 Or 458, 468-69, 226 P2d 501 (1951).

The court there evidenced a realization that investment schemes, from which the public needs to be protected, come in many forms and that a flexible approach for dealing with such schemes is necessary. The "risk capital" test protects the public by requiring those whose schemes fit within the conditions set down by the test to register their schemes so as to make potential investors aware of the fact that their capital will be risked before the working foundations of the enterprise are firmly in place.

■■ We hold that the *Howey* test is not exclusive and that the "risk capital" test is also to be used in determining whether a particular financial activity constitutes an offer of an "investment contract" which must be registered. It follows that if a substantial portion of the initial capital which a franchisor uses to initiate its operations is being provided by the franchisees, then the franchisor must register his enterprise under the Oregon Securities Act.[⊕]

---

[⊕] There has been discussion concerning the exact scope of the coverage of the "risk capital" test. Shortly after the California Attorney General's opinion was written, the California Corporation Commissioner issued a bulletin, Cal Div of Corp Bull No. 67-8 (July 14, 1967), which outlined the financial and economic situation which would have to exist to create the implication that a franchise agreement was a security in California. According to this bulletin, the implication will arise unless the franchisor can

■ It only remains for us to decide whether the franchise agreement in the case at bar qualifies as a security under the "risk capital" test. Under the test it is necessary to conceptualize defendants' business as being composed of two separate enterprises. In the first enterprise each franchisee pays $1,350 in "risk capital" to CBS which uses the money to develop the Consumer Buyer's Guide and the organization which will sell memberships in CBS. In the second enterprise, franchisees, managers and representatives solicit memberships in CBS, using Consumer Buyer's

---

show: (1) adequate capital to operate the franchising program for an indefinite length of time, without the necessity of resorting to the funds to be contributed by the franchisee; (2) successful business operation in the past; and (3) adequate facilities to successfully administer the franchising program. The Commissioner indicated that if one of these factors, and especially factor (1), were missing, the implication would arise that a security existed.

A federal district court, Mr. Steak, Inc. v. River City Steak, Inc., Civil Action C-1787 (D Colo, filed Sept. 30, 1970), has decided that the *Silver Hills* test should be limited to situations where exceptionally high risk, speculative franchises were involved. In these instances the investor, even if he could participate in or control some phase of the enterprise, is gambling "risk capital," where there is less than an even chance of success, against the opportunity for large profits. In all other situations, the court felt that the risk undertaken by the franchisee was incident to the conduct of his business.

It has been suggested that if the purpose of the securities laws is to protect the investing public against spurious schemes, then "risk capital" should be defined to include schemes to raise capital for existing but unproven business as well as schemes to raise initial capital, Note, Franchise Regulation Under the California Corporate Securities Law, 5 San Diego L Rev 140, 164-66 (1968), and another comment has criticized the "risk capital" test as being too limited, because it does not protect the franchisee from older, more affluent franchisors, who, because they are neither new, nor undercapitalized, would not be covered under the California interpretation of the test, but who, because of their economic power are more capable of doing harm to their investor franchisees. Note, Regulation of the Franchise as a Security, 19 Journal of Public Law 105, 126 (1970).

Guides provided by defendants. We are concerned only with the first enterprise.

Defendants first contend that even if the "risk capital" test is used, the franchisees cannot be considered to have invested in the development of the franchisors' product because the product which defendants developed was not the Consumer Buyer's Guide, but the concept of the Guide, which was already in existence when the franchisees were contacted.

Even if we agreed, which we do not, that defendants' concept is its product, this argument would have no merit. Under the "risk capital" test we are concerned with whether the franchisor is dependent upon the franchisees' capital to initiate his operations, not just manufacture his product. In the case at bar, the evidence is that the defendants were dependent upon the money paid in by its franchisees for both developmental and operating expenses.[10]

Defendants next argue that the franchisees involved themselves in the development of the Guide, and, therefore, the state has failed to prove a security under the *Howey* test, because an investor who participates in the making of profits (or in this case the Guide) does not need the protection that the Securities Laws were intended to provide.

---

[10] The primary source of defendants' income was from the sale of franchises. Defendants entered Oregon on August 26, 1969, and were receiving income solely from franchise sales until October 14, 1969, when the Consumer Buyer's Guide was published. Defendants admitted that up until the time of trial only between 10 and 15 subscriptions had been sold to the public. Defendants also testified that they increased their franchise fee from $1,055 to $1,350 because "we felt that by raising the price we could put on a better program, going to more advertising, so forth." Finally, between Oregon and Washington, CBS had collected over $80,000 in franchise fees. Yet, it had only a $20,000 balance in its bank account for the combined franchise fees received from four states.

As the trial judge pointed out in his well-reasoned oral opinion, under the *Silver Hills* theory, the courts are not concerned so much with whether the investor derives his profit solely or substantially from the efforts of others, but rather with whether the franchisor is depending on the investor for a substantial portion of the initial capital needed to start the enterprise. Here, CBS was dependent upon the franchisees for a substantial portion of its initial capital.

In *Union Land Associates v. Ussher*, 174 Or 453, 457, 149 P2d 568 (1944), the court stated that "The Blue Sky Law was enacted for the protection of the public and, to effectuate such purpose, it should be liberally construed." The court goes on to say that the law was not intended to regulate every commercial transaction or investment. The franchise is a new (and at times highly risky) approach to investment which does not fall into the traditional mold which shapes the form of most investment situations. We believe that the "risk capital" test is a sound tool to use in analyzing franchising agreements in order to determine whether or not they need to be registered so as to apprise the investing public of the risks involved in an enterprise. Applying the "risk capital" test to the franchising agreement in this case leads to the conclusion that it is a security which must be registered under the Oregon Securities Laws.

Reversed and remanded.