Argued January 6, affirmed as to case numbers 386-727, 386-729, 386-730 and 393-043; reversed as to 386-734, July 3, 1975

BERGQUIST ET AL, *Respondents, v.*
INTERNATIONAL REALTY, LTD. ET AL,
*Appellants.*
537 P2d 553

*Ronald J. Loew,* Portland, argued the cause for appellants International Realty and Stanley Harris. John J. Haugh, Portland, argued the cause for appellant Shepherd. With them on the joint briefs were O'Connell, Goyak & Haugh, P.C., Portland.

*Mark C. McClanahan* and *Peter C. Richter,* Portland, argued the cause for respondents Bergquist, Landauer, Parker and Anderson and counsel for respondent Atwood. With them on the brief were Miller, Anderson, Nash, Yerke & Wiener, Portland, and Nikolaus Albrecht, Portland, as attorney for respondent Atwood.

Lee Johnson, Attorney General, W. Michael Gillette, Solicitor General, and Jim G. Russell, Assistant

418

Attorney General, Salem, filed a brief as amicus curiae for Corporation Division.

BRYSON, J.

The plaintiffs commenced five separate suits to rescind a contract of sale whereby they purchased undivided fractional interests in the Spanish Villa, an apartment complex in Washington County, Oregon, for the sum of $600,000 from defendant International Realty, Ltd., a corporation (hereinafter International). Plaintiffs alleged that defendants, in effecting such sales to plaintiffs, engaged in the sale of unregistered, nonexempt "securities" in violation of the Oregon Securities Law, ORS Chapter 59, and sought recovery under the provisions thereof.

The suits, by order of the court pursuant to ORS 11.050, were consolidated for trial to determine if the transaction between the parties constituted the sale of "securities" and to determine the rights and liabilities of the respective parties pursuant to the Oregon Securities Law.

The trial court found the sales-leaseback contracts to be unregistered, nonexempt securities (investment contracts) and entered a decree in favor of plaintiffs. Defendants appeal.

Defendant International is an Oregon licensed real estate broker specializing in the sale of apartment houses and real property investments. It employs numerous associate brokers. Defendant Stanley Harris is a licensed broker and president-manager of International and specializes in real estate investments as "tax shelters." Defendant Shepherd is the designer-contractor who built the Spanish Villa and sold the

same to International and leased it back from the plaintiffs.

In the fall of 1969 Shepherd and International discussed the sale of Spanish Villa to International with a leaseback to Shepherd. Shepherd had a $400,000 construction loan from a bank with a take-out long term note and mortgage to Pacific First Federal Savings and Loan. In spite of this, Shepherd was experiencing financial difficulty as a result of constructing Spanish Villa. These discussions between Harris, of International, and Shepherd led to the execution of an agreement dated November 21, 1969, between Shepherd, seller, and International, buyer, for the sale and purchase of Spanish Villa and provided that Shepherd would lease back the apartment simultaneous with the sale to International. On December 20, 1969, International purchased Spanish Villa from Shepherd pursuant to a land sale contract for the sum of $540,000.

After the November 21, 1969, agreement was executed, International began marketing or finding purchasers for its interest in Spanish Villa. Harris, through International, interested the plaintiffs and others, as investors, to purchase varying percentages in Spanish Villa; the total interest of the purchasers represents the 100 percent interest of International.

Harris testified:

"A * * * [W]e had to have what is called a swing man that would take a significant piece of it, generally 30 per cent or more or about a third in order to make—make it possible for smaller investors to participate without making it a public offering, so we had to have the swing man lined up ahead of time. * * *."

The plaintiffs Parker were unknowingly designated the "swing man." Harris further testified, including his deposition read into the record, as follows:

"A * * * I am still not too clear on what the

security laws are since they have been explained ten different ways by ten different people to me since then. We were structuring it from a tax point of view and I think in—in taking my remarks out of context we are thinking firstly that a security does not have the depreciation allowed from the Federal income tax, so we structured this from the tax point of view so that the tax people would not declare it a security or the SEC would not. * * *.

"* * * * *.

"A * * * [W]e were pioneering some ground that a lease would get around the Securities & Exchange Commission requirement that you simultaneously sold to a group of people and provided management, centralized management immediately. There was a Florida case that said it could be turned to security, but if it was an undivided interest and it was leased back, then it was not a security. So we had to work within the scope of our own operation and our own license."

Dr. Bergquist, one of the plaintiffs, described his understanding with Harris as follows:

"A Well, I don't recall specifically, but he [Harris] told me that he had 15 per cent of an apartment house available and that there would be certain income tax advantage to me to own this. It was my understanding that this was a limited partner ventureship.

"Q Where did you get that understanding?

"A From Mr. Harris.

"* * * * *.

"A Well, Mr. Harris outlined and showed me a lot of figures that I really don't understand about, prepaid taxes, cash flow and all that sort of thing.

"* * * * *.

"A I would own 15 per cent of the apartment, but I had no actual control of it.

"Q  Is that what Mr. Harris told you?

"A  That was my understanding, yes."

Plaintiff Sarah Landauer testified that Harris explained the transaction to her as follows:

"A  He [Harris] said that the new property was a new apartment house that would not need much upkeep, that, you know, there wouldn't have to be a lot of investment in it. What we put into the property initially would be all that we have to do. It would just be an investment. We put in that amount of money and just step aside and that would be it and the combination of what tax shelter there was and the cash flow from the apartment house would help service a loan that we had taken out in order to pay for the property."

International sold Spanish Villa to plaintiffs and others by land sale contract dated December 20, 1969, for the sum of $600,000 with $47,000 of the down payment being "prepaid interest through DECEMBER 31, 1970." The plaintiffs actually signed the contract on different dates sometime after December 25, 1969. Plaintiffs purchased a total of 72 percent of International's 100 percent interest.

Upon signing the December 20, 1969, agreement to purchase, the plaintiffs and other purchasers executed, as of the same date, a lease of the apartment back to Shepherd for a period of four and one-half years with options to renew.[1]  International was to serve as escrow agent for the receipt and disbursement of all funds. There is testimony that Harris stated that he was using this "form of investment contract to avoid having to register it as a security."

This is a summarization of the evidence, in-

---

[1] *See* Note, 1972 Duke L J 1221 for discussion of sale-leaseback arrangements as "securities."

cluding numerous exhibits which we have reviewed, describing this transaction.[2]

Defendants first contend that the court erred "in holding that the respective sales of interests in Spanish Villa were sales of an investment contract and therefore a security required to be registered under ORS 59.055."

ORS 59.015(13)(a)[3] provides:

" 'Security' means a note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in a pension plan or profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract,* voting-trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments

[2] For a similar transaction by defendants Harris and International using a partnership operation to interest purchasers in avoiding income taxes and creating "tax shelters" by making prepaid interest payments during the last week of a calendar year, *see* Starr v. International Realty, 271 Or 396, 533 P2d 165 (1975).

[3] *Compare* Uniform Securities Act (ULA) § 401, 746 (7 Master ed 1970). The drafters of ORS 59.015(13)(a) testified before the Oregon Legislature that while the defintions in the 1967 revision to the Oregon Securities Law (Or Laws 1967, Ch 537) were very similar to the definitions in the Uniform Act, the revision went beyond the Uniform Act. The Corporation Commissioner testified that only portions of the Uniform Act were selectively incorporated into the revision bill (House Bill 1299) because the Uniform Act, in its entirety, was a "Lessing [sic] modification and a lowering of standards already in Oregon." Hearings on House Bill 1299 Before the House Judiciary Committee, 54th Oregon Legislative Assembly, Regular Session (February 24 & 27, 1967).

"HB 1299 substantially improves the present Oregon Securities Law by clarification and simplification, elimination of many ambiguities, and by providing better guidelines * * *. However, HB 1299 retains the basic protections, concepts and structure of existing law." Hearings on House Bill 1299 Before the Senate Judiciary Committee, 54th Oregon Legislative Assembly, Regular Session (May 8 & 17, 1967).

out of production under such title or lease, *or, in general, any interest or instrument commonly known as a 'security,'*[④] or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing." (Emphasis supplied.)

■ We construe this statute liberally in light of the legislative purpose of the Oregon Securities Law to afford the "greatest possible protection" to the public. *Day v. Saunders,* 270 Or 432, 528 P2d 513 (1974); *Adams v. American Western Securities,* 265 Or 514, 524, 510 P2d 838 (1973); *Union Land Associates v. Ussher,* 174 Or 453, 457, 149 P2d 568 (1944).

■ In addition, we note the legislature's concern in its 1967 revision of the Oregon Securities Law to "protect the public investor more than present law" does by adopting, in particular, a definition which "is intended to include every possible kind of interest in a venture." Hearings on House Bill 1299 Before the House Judiciary Committee, 54th Oregon Legislative Assembly, Regular Session (February 24 & 27, 1967).

Numerous writers have discussed the definition of a "security" or "investment contract"[⑤] following

---

④ This particular clause is not a limitation on the statutory definition of "security." Sperry & Hutchinson Co. v. Hudson et al, 190 Or 458, 467-68, 226 P2d 501 (1951); State v. Simons and Blanchard, 193 Or 274, 288-89, 238 P2d 247 (1951).

⑤ *See generally,* 1 Loss, Securities Regulation 483 (2d ed 1961); Berman & Stone, Federal Securities Law and the Sale of Condominiums, Homes, and Homesites, 30 Bus Law 411 (1975); Coffey, The Economic Realities of a "Security": Is There a More Meaningful Formula?, 18 West Res L Rev 367 (1967); Cowett, Federal-State Relationships in Securities Regulation, 28 Geo Wash L Rev 287 (1958); Hannan & Thomas, The Importance of Economic Reality and Risk in Defining Federal Securities, 25 Hast L J 219 (1974); Long, An Attempt to Return "Investment Contracts" to the Mainstream of Securities Regulation, 24 Okla L Rev 135 (1971); Spencer, Private Placement of Securities in

the "test" developed by the United States Supreme Court under the Federal Securities Act in *SEC v. W. J. Howey Co.*, 328 US 293, 66 S Ct 1100, 90 L ed 1244 (1946).

> "In other words, an investment contract for purposes of the [Federal] Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party * * *." *SEC v. W. J. Howey Co.*, 328 US at 298-99.

Our cases, as well as the federal decisions, have expressly avoided "hard-and-fast" rules in determining what financial transactions constitute a "security" or "investment contract."⑥

In *Sperry & Hutchinson Co. v. Hudson et al,* 190 Or 458, 226 P2d 501 (1951), this court stated:

> "It would not only be inadvisable, but also impossible to lay down a fixed rule for determining in every case that might arise just what is or is not a 'security' within the meaning of the * * * [Oregon Securities Law]. As was said * * * in *State v. Whiteaker et al* [118 Or 656], at page 661:
>
> " 'We do not deem it advisable to lay down any hard-and-fast rule to determine whether similar offerings to the public may be sold without a license. Were we to do so, a certain class of gentlemen

---

Oregon: The Legal Framework, 53 Or L Rev 131 (1974); Note, 6 Creighton L Rev 450 (1973); Note, 1972 Duke L J, *supra* note 1; Note, 48 Tul L Rev 738 (1974); Note, 27 U Miami L Rev 487 (1973). *See also* Annot., 47 ALR3d 1375 (1973); Annot., 3 ALR Fed 592 (1970).

⑥ State v. Consumer Business System, 5 Or App 19, 29, 482 P2d 549 (1971). Two states and one federal circuit court have rejected *Howey* as an absolute test. *See* State v. Hawaii Market Center, Inc., 52 Hawaii 642, 485 P2d 105 (1971); Silver Hills Country Club v. Sobieski, 55 Cal 2d 811, 361 P2d 906, 13 Cal Rptr 186 (1961); Securities & Exchange Com'n. v. Glenn W. Turner Ent., Inc., 474 F2d 476 (9th Cir 1973).

\* \* \*—"they toil not neither do they spin"—would lie awake nights endeavoring to conceive some devious and shadowy way of evading the law. It is more advisable to deal with each case as it arises. \* \* \*'

"The terms 'evidence of indebtedness,' 'certificate of interest or participation in any profit-sharing agreement,' and 'investment contract' as used in the act refer only to such of those types as are commonly known as 'securities'; they contemplate the presence of the investment process, that is, 'the investment of funds \* \* \* with a view of receiving a profit through the efforts of others than the investor.' \* \* \*." 190 Or at 468-69.

*See also Union Land Associates v. Ussher,* 174 Or 453, 457, 149 P2d 568 (1944); *State v. Simons and Blanchard,* 193 Or 274, 290, 238 P2d 247 (1951).

In *State v. Simons and Blanchard, supra* at 290, decided after *SEC v. W. J. Howey Co., supra,* we held:

"\* \* \* [A]n 'investment contract' [is] one which contemplates the entrusting of money or other capital to another, with the expectation of deriving a profit or income therefrom, to be created through the efforts of other persons.' \* \* \*." (Relying on *SEC v. Bailey,* 41 F Supp 647 (SD Fla 1941).

To cover varying schemes or transactions based on differing facts, other standards have been used to augment the basic rule.[7] Inflexible rules can only encourage the use of evasive tactics and devices which are not in the best interest of the public. *State v.*

---

[7] One alternative is the "risk capital" concept as applied in Silver Hills Country Club v. Sobieski, *supra* note 6. A second alternative is the utilization of an explicit test, but with flexible and expansive application thereof. *See, e.g.,* Securities & Exchange Com'n v. Glenn W. Turner Ent., Inc., *supra* note 6. A third alternative adopts a balanced approach. *See* Coffey, *supra* note 5 (adopted in State v. Hawaii Market Center, Inc., *supra* note 6); Long, *supra* note 5; Hannan & Thomas, *supra* note 5; Note, 1972 Duke L J, *supra* note 1.

*Whiteaker et al*, 118 Or 656, 247 P 1077 (1926); *State v. Simons and Blanchard, supra* at 291-92. *See also Tcherepnin v. Knight*, 389 US 332, 336, 338, 88 S Ct 548, 19 L ed 2d 564 (1967).

As specifically stated by one of the leading writers in 1 Loss, Securities Regulation 494 (2d ed):

"* * * [I]t is perfectly clear that an investment contract is involved in the public offering of fractional, undivided interests in * * * an apartment building * * * [where] ownership is not synonymous with occupancy under some sort of arrangement whereby the promoter or a nominee as lessee assumes the responsibility of physical management of the property and distribution of the profits to the co-owners." (Citations omitted.)

*See also* 1 Loss, Securities Regulation 2507 (2d ed 1961, Supp 1969).

The case at bar was not an "ordinary commercial transaction" between a knowing buyer and a seller. The plaintiffs neither knew nor understood the intricacies of the transaction. It was a scheme devised by defendant Harris to sell fractional interests to plaintiff investors to raise risk capital for defendant Shepherd, creating a high degree of risk to the plaintiff investors. Harris' plan included the leaseback to Shepherd, giving Shepherd actual control and management of the apartment. Plaintiffs did not have control of the investment property. By agreement, all sums paid by Shepherd pursuant to the lease were paid to International as escrow agent who in turn paid plaintiffs on their investment (after payment on the senior mortgage) according to their fractional undivided interests. International, through its organization and associate brokers, solicited the public, and plaintiffs in particular, for the sale of fractional sales as an investment. Harris held meetings or seminars not unlike those in "Dare To Be Great," *Securities & Exchange Com'n. v. Glenn W.*

*Turner Ent., Inc.,* 474 F2d 476 (9th Cir 1973), where he extolled the advantages of purchasing fractional undivided shares in real property as a "tax shelter." Indeed, one of the persons attending such seminars referred Dr. Bergquist, plaintiff, to International to make the investment here involved. The plaintiffs' investments were in a common enterprise and their return on the investment was to come solely from the efforts of Shepherd as the lessee and manager of the apartments. Plaintiffs individually and separately signed the documents drawn by International to be effective simultaneously as of December 20, 1969.

The above facts included in the trial court's findings are supported by an abundance of evidence. These facts meet the tests laid down in *SEC v. W. J. Howey Co., supra,* and in *State v. Simons and Blanchard, supra,* and the Oregon Securities Laws, ORS Chapter 59.

We are cognizant of the language in *State v. Whiteaker, supra* at 661, that exempts *ordinary* commercial transactions from our securities law.⑨ The facts in this case do not constitute an *ordinary* commercial transaction. It was a complex contractual arrangement to sell undivided fractional interests, subject to a leaseback, where the purchasers did not have possession or control, as distinguished from the ordinary commercial real estate transaction. We find the sales and leaseback were sales of an investment contract within the meaning of ORS 59.015(13)(a), and the trial court did not err in this respect.

### ANDERSON v. INTERNATIONAL, CASE NO. *393-043*

■ Defendants next contend that the statute of

⑨ One writer suggests that ordinary commercial leases can be distinguished by their financing aspects and by the services provided thereunder by the lessor. *See* Note, 1972 Duke L J, *supra* note 1 at 1247-248.

limitations had run prior to the filing of the complaint by plaintiffs Loyed and Dorothy Anderson and that the trial court erred in refusing to dismiss the complaint.

There is no contention that the cases of the other four plaintiffs were not timely filed. This assignment must be considered within the framework of all the cases for the following reason. The record shows that all of the plaintiffs except the Andersons filed separate but substantially similar class suits on or about December 20, 1972.

Paragraph I of the other complaints as originally filed alleges:

> "Plaintiffs bring this suit on behalf of themselves individually and on behalf of all of the class described as those who purchased interests in the Spanish Villa, hereinafter described, * * *."

No one contends that the Andersons were not properly within the "class" as alleged in the other four complaints. The defendants filed a motion against paragraph I of the original complaints as follows:

"I

> "Striking therefrom entire paragraph I; or, in the alternative, requiring that plaintiff make said paragraph more definite and certain by either setting forth the name of each member of the class therein alleged or pleading facts sufficient to excuse their anonymity."

At the hearing on the motion, before the presiding judge, no ruling was made as to whether the first four suits were proper class suits because the parties stipulated among themselves and with the court that an order would be entered granting the motion but on terms avoiding the question of the statute of limitations. Pursuant to the stipulation, Presiding

Judge Dale signed the following order on May 29, 1973:

"NOW, THEREFORE, IT IS HEREBY ORDERED that defendants' motion to strike the entire Paragraph I from plaintiffs' complaint be and the same is hereby allowed *on the stipulation of all parties.* Defendants shall within 10 days from the date hereof furnish plaintiffs with a list of all persons known to them to have held any interest on or before December 20, 1972, in that certain property known as Spanish Villa. Plaintiffs shall within 10 days thereafter notify all such persons that they may within 10 days of the date of such notification institute suit against defendants by filing complaints substantially in a form similar to the Amended Complaint to be filed herein by plaintiffs pursuant to this order. Defendants will not assert any statute of limitation defense (except to the extent available against plaintiffs herein) against such complaints filed by such persons prior to expiration of such 10-day period and pursuant to such notification." (Emphasis added.)

Defendants did not furnish plaintiffs with a list of persons holding an interest in Spanish Villa as ordered by the court. Thereafter the Andersons filed their complaint within the period allowed in the order of May 29, 1973. Also, the complaints in each of the other four suits were amended to eliminate the allegation that the suits were brought as "class suits" and subsequently the presiding judge signed the order consolidating all five cases for trial.

Defendants International and Harris filed their answer admitting the existence of the written land sale contracts and generally denied the remainder of the allegations of the complaint. Defendant Shepherd filed a general denial. At trial, and for the first time, defendants International and Harris, but not Shepherd, raised the question of the statute of limi-

tations as to the complaint of the Andersons, but not as to the complaints in the other four suits.

The Andersons filed their complaint more than three years after they had purchased the unregistered securities from defendants. Their amended complaint alleges false representations and reliance thereon and a violation of the Oregon Securities Law.

When the defendants raised the timeliness of the Andersons' suit at trial, the trial court ruled that it had jurisdiction "based upon the original class suit. * * * [T]hus this Court is of the opinion that the December 20th date when the Bergquist case was filed creates a class suit and takes it out of the statute of limitations." It was this ruling that the defendants assign as error.

ORS 59.115 provides in part:

"(5) No action or suit may be commenced under this section more than three years after the sale."

Under the above statute the Anderson suit would have been untimely filed. *Lamb v. Young*, 250 Or 228, 230-33, 441 P2d 616 (1968).

However, no one denies that the Andersons were properly members of the class as alleged in each of the four class suits originally filed by the other plaintiffs. It is beyond question that none of the alleged members of the class, which included plaintiffs Anderson, would have been barred from recovery under ORS 59.115 had a class suit been successfully prosecuted. *Dunne v. Portland Street Ry. Co.*, 40 Or 295, 299-300, 65 P 1052 (1902); Clark, The Law of Code Pleading 401, § 63 (2d ed 1947); 54 CJS Limitation of Actions § 278 (1948).

This raises the question: Should the Andersons, members of the class as alleged in the original suits, be barred from recovery when all parties pursue their

individual remedies after a timely class suit under ORS 59.115 is withdrawn by stipulation of the attorneys and order of the court?[@]

In *American Pipe and Construction Co. v. Utah,* 414 US 538, 94 S Ct 756, 38 Led2d 713 (1974), the United States Supreme Court held:

> "We are convinced that the rule \* \* \* must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." (Footnote omitted.) 414 US at 554.

We are not unmindful of the distinctions between federal class suits and Code class suits as well as the distinctions between statutory limitations on remedies and statutory limitations on rights. Nevertheless, under the facts of this case where plaintiffs Anderson had foregone their right to proceed under any one of the original class suits based on the stipulation and court order, we believe the general principles enunciated in *American Pipe and Construction Co. v. Utah, supra,* is the preferable rule to follow in this instance.

For these reasons we conclude that the Andersons were not barred from commencing their individual suit, as did the other plaintiffs, and the trial court did not err in this respect.

### ATWOOD v. INTERNATIONAL, CASE NO. 386-734

■ As their final assignment of error, defendants contend that the trial court erred in finding that plaintiff Atwood came into court with clean hands

---

[@] The parties were not so numerous that it would have been impractical to have all parties before the court. *See* Clark, The Law of Code Pleading § 63 (2d ed 1947); Lonsford et al v. Burton et al, 200 Or 497, 267 P2d 208 (1954).

and did not participate in the sale of the investment contracts.

At the conclusion of the trial, the court expressed doubt as to Atwood's recovery in this suit and stated:

> "There has been a question in my mind throughout this trial with regard to the Plaintiff Atwood, and I certainly would not allow Mr. Atwood to recover if I felt that he aided in and abetted in the sale of this property."

But the court finally concluded "that Mr. Atwood had come into court with clean hands * * *."

On October 18, 1969, Atwood obtained the listing for Spanish Villa from defendant Charles Shepherd. Thereafter, Atwood continued to be involved in Spanish Villa in a capacity beyond that of a "mere listing agent," contrary to his contentions on appeal.

First, Harris' appointment book was received in evidence and revealed scheduled meetings between Harris and "Chuck Sheppherd [sic] w/Atwood" for November 18, 1969, and "Sheppherd [sic] w/Atwood" for November 21, 1969, and "Jim & Clara Parker [one of the plaintiffs herein]" for December 18, 1969.[10]

Second, on December 10, 1969, the earnest money receipt for the sale of Spanish Villa to International was executed and Atwood's signature appears on this receipt.[11] Atwood admits the signature, but could not recall the reason therefor.

Third, a letter dated January 12, 1970, from Shepherd to Atwood and an undated worksheet in Atwood's handwriting show that Atwood acted as escrow agent for the parties at the time. Moreover,

---

[10] *N.B.* these meetings are scheduled for dates after the formulation of the sale-leaseback plan.

[11] The earnest money receipt contains provisions for the sale and leaseback of Spanish Villa.

Atwood admits that he had taken an "active role" in transferring the escrow functions of International.

The record also shows that Atwood has been substantially compensated for his efforts in obtaining the original listing of Spanish Villa for International and is the beneficiary of certain commissions arising out of unlawful sales of Spanish Villa investment contracts. These pecuniary benefits were realized in a prior judgment obtained by Atwood against defendants. *Atwood v. International Realty, Ltd., et al,* No. 376-497 (Multnomah County 1972), *aff'd* 266 Or 595, 514 P2d 553 (1973). In that case, Atwood alleged that he was entitled to commissions totalling $16,440 earned as "listing," "selling," and "joint selling" agent of Spanish Villa.

For these reasons defendants contend that Atwood should be barred from equitable relief because he has "profited by the same transaction which he now seeks to rescind" and that Atwood did not tender back or return the benefits he received as a direct result of the unlawful sales. We agree.

In *Oliphant v. French,* 256 Or 341, 347, 472 P2d 275 (1970), we stated, "Equity will refuse to aid a plaintiff whose claims had their inception in his own wrongdoing * * *. [Citing with approval *Casteel v. King et al,* 201 Or 234, 269 P2d 529 (1954)]." *See also Robinson v. Manning,* 233 Or 392, 398, 378 P2d 277 (1963). One such as Atwood, who secures a listing for the sale of real property and receives a commission on the sale thereby putting the whole scheme in motion, cannot thereafter be heard to complain and demand damages from one or more of his fellow cohorts. We find the court erred in this respect.

Affirmed as to case numbers 386-727, 386-729, 386-730, and 393-043; reversed as to case number 386-734, *Atwood v. International Realty, Ltd.*